UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

FISERV SOLUTIONS, INC.,

        Plaintiff,

        v.                                    Case No.  11-C-0603

ENDURANCE AMERICAN SPECIALTY
INSURANCE COMPANY, XL SPECIALTY
INSURANCE COMPANY, NATIONAL UNION
FIRE INSURANCE COMPANY OF PITTSBURGH PA,
and CONTINENTAL CASUALTY COMPANY,

        Defendants.

## DECISION AND ORDER GRANTING IN PART AND DENYING IN PART MOTIONS IN LIMINE TO PRECLUDE TESTIMONY OF KOCHENBURGER (DOCS. 104, 105), GRANTING MOTIONS IN LIMINE TO PRECLUDE TESTIMONY OF NEWMAN (DOCS. 103, 107), AND GRANTING MOTIONS IN LIMINE TO PRECLUDE TESTIMONY OF LAVELLE (DOCS. 105, 107)

Policyholder Fiserv Solutions, Inc. sues four insurers under various claims-made policies for an amount paid to settle North Carolina litigation. In the North Carolina action, Bank of America sued First American Title Insurance Company, which then sued Fiserv in a third-party claim.

Before this court are four motions in limine concerning the testimony of three proposed expert witnesses. The defendants comprise two groups based on when they provided insurance to Fiserv. Fiserv hired one expert witness and each group of insurers hired an expert to rebut Fiserv's.

As relevant to this case, Fiserv purchased various insurance policies as part of its insurance programs (or insurance "towers") for two contiguous policy years: (1) July 1, 2008, to July 1, 2009 ("Tower 1"), and (2) July 1, 2009, to July 1, 2010 ("Tower 2"). Defendants National Union Fire Insurance Company of Pittsburgh, PA, and Continental

Casualty Company provided excess insurance policies as part of Tower 1. These insurers will be referred to as the "Tower 1 Insurers." Defendants Endurance American Specialty Insurance Company and XL Specialty Insurance Company provided excess insurance policies as part of Tower 2. These insurers will be referred to as the "Tower 2 Insurers."

Each group's expert is challenged by the other group.[1] The court will address the arguments respecting each expert sequentially, as the issues raised by the two opposing groups often overlap.

## BACKGROUND

As pertinent to this case, Towers 1 and 2 each consisted of three insurers—one primary-level and two excess level. Tower 1 contained Hiscox Syndicates Limited, whose $20 million in limits under the primary policy were exhausted by other claims, and now consists of National Union and Continental, the second and third excess layers respectively, with limits of $10 million each. Tower 2 contained Westchester Fire Insurance Company with a $10 million primary policy, plus Endurance and XL Specialty, which issued, respectively, second and third-layer excess policies with limits of $15 million each. Westchester has settled with Fiserv and has been dismissed from this case.

In a letter dated June 25, 2009, just prior to the expiration of the Tower 1 policy period, Fiserv submitted to the Tower 1 Insurers a notice of potential claims (the "June 2009 notice"). In the June 2009 notice, Fiserv alerted the Tower 1 Insurers to circumstances involving Fiserv's home equity loan program, QuickClose. Through QuickClose, Fiserv provided title-related services for lenders who originated home equity

---

[1] The Tower 2 Insurers filed a separate motion as to each opposing expert, while Fiserv and the Tower 1 Insurers filed one motion attacking both of the opposing experts, resulting in four motions regarding three experts.

2

loans without a full title search. In that role, Fiserv acted as a title agent for First American, which issued a form of limited title insurance on such home equity loans.

In April 2010, after expiration of the Tower 1 policies, First American filed a third-party suit against Fiserv in a North Carolina case brought by Bank of America against First American (the "North Carolina action"). First American claimed negligence by Fiserv respecting the QuickClose program. Fiserv provided notice of the North Carolina action to the Tower 1 Insurers, to which it had submitted the June 2009 notice, as well as the Tower 2 Insurers, whose policies were in effect when the claim against Fiserv in the North Carolina action was filed. The Tower 1 Insurers did not accept the North Carolina action claim under their policies. On the other hand, primary Tower 2 insurer, Westchester, agreed to defend Fiserv in the North Carolina action. However, a dispute subsequently arose as to whether the North Carolina action was a claim first made within the Tower 2 policy period or a claim that falls back to the Tower 1 policy period under the June 2009 notice. In the present case, Fiserv seeks coverage under one or both towers.

## DISCUSSION

Expert testimony is governed by Fed. R. Evid. 702, which reads:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
    (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
    (b) the testimony is based on sufficient facts or data;
    (c) the testimony is the product of reliable principles and methods; and
    (d) the expert has reliably applied the principles and methods to the facts of the case.

Thus, under Rule 702 the court must engage in a three-step analysis: (1) whether the witness qualifies as an expert; (2) whether the expert's methodology is reliable; and (3)

3

whether the testimony will assist the trier of fact to understand the evidence or determine a fact in issue. *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010). The proponent of the expert's testimony bears the burden of proving admissibility of the testimony by a preponderance of the evidence. *Lewis v. CITGO Petro. Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

The district court is to act as a "gatekeeper," ensuring that expert testimony satisfies Rule 702's requirements. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999); *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765 (7th Cir. 2013); *see Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). But that role does not render the district court the trier of all facts relating to expert testimony; the jury must be allowed to play its essential role in assessing the expert's credibility and weighing the expert testimony. *Stollings*, 725 F.3d at 765.

Regarding reliability, an expert should "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152. The district judge must ensure that the expert used a valid methodology, sufficient data justified the use of the methodology, and the expert applied the methodology appropriately. *Stollings*, 725 F.3d at 765. The district judge has considerable leeway in determining whether particular expert testimony is reliable. *Manpower, Inc. v. Ins. Co.*, 732 F.3d 796, 806 (7th Cir. 2013). However, there must be a "link between the facts or data the expert has worked with and the conclusion the expert's testimony is intended to support." *United States v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003). Various factors for consideration, to the extent they apply in the particular context, include whether a theory or technique can be and has been tested, subject to peer review

4

and publication, or generally accepted, but no definitive checklist exists; the inquiry is flexible. *See Daubert*, 509 U.S. at 593-94.

Nevertheless, the district judge's gatekeeping role does not extend to the reliability of the conclusions those methods produce; that the conclusions can be impeached does not mean the testimony is unreliable. *Stollings*, 725 F.3d at 765; *see Daubert*, 509 U.S. at 595. "An expert may provide expert testimony based on a valid and properly applied methodology and still offer a conclusion that is subject to doubt. It is the role of the jury to weigh these sources of doubt." *Stollings,* 725 F.3d at 766. The district court should not bar an expert because the judge questions the quality of the data used in applying the methodology; the factual underpinnings of the expert's analysis are factual matters for the trier of fact, so long as the methodology is sound. *Manpower, Inc.*, 732 F.3d at 806-08.[2]

Rule 702 allows an expert to educate the factfinder about general principles, without applying the principles to the specific facts of the case. Fed. R. Evid. 702 advisory committee notes 2000 amendments. However, when expert testimony does not rely on anything like a scientific method, the district judge should evaluate whether the testimony is "properly grounded, well-reasoned, and not speculative . . . . The expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded." *Id.*

---

[2] In *Stollings*, for instance, the Seventh Circuit held that the district court violated the province of the jury by barring an expert's testimony because the amount of one input in his data was uncertain. 725 F.3d at 766. The appellate court found that the judge should have let the uncertainty of the input and, thus, the expert's conclusion, be subject to cross-examination and the jury's determination. *Id.* at 766-67. Similarly, the court found in *Manpower, Inc.* that the district court abused its discretion in barring expert testimony about business interruption loss because the expert used a business growth rate that the court questioned. 732 F.3d at 801-02, 807-10.

Experience alone may provide a sufficient foundation for expert testimony, but the expert "must explain how that experience leads to the conclusions reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Id.*; *see Metavante Corp. V. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010). The trial court's gatekeeping function requires more than simply taking the expert's word for it; expert testimony is not admitted merely because an expert gives it. *See* Fed. R. Evid. 702 advisory committee notes 2000 amendments; *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert.").

As to relevance, testimony is excludable if it cannot help the trier of fact to understand the evidence or determine a fact in issue or fails to make a fact more or less probable. Fed. R. Evid. 401, 702(a). Expert testimony is not relevant if the expert's opinions are legal opinions that usurp the role of the court. *Good Shepherd Manor Found., Inc. v. City of Momence,* 323 F.3d 557 (7th Cir. 2003) ("[E]xpert testimony as to legal conclusions that will determine the outcome of the case is inadmissible."); *see Scottsdale Ins. Co. v. City of Waukegan*, 689 F. Supp. 2d 1018, 1022 (N.D. Ill. 2010). Although experts may provide opinions on the ultimate factual issues in a case, *Scottsdale Ins. Co.*, 689 F. Supp. 2d at 1022; *see* Fed. R. Evid. 704, they may not testify as to determinative legal conclusions, *see Good Shepherd Manor Found., Inc.*, 323 F.3d at 564.

Under Wisconsin law, the construction and interpretation of an insurance policy is a question of law for the court. *Kremers-Urban Co. v. Am. Emp'rs Ins. Co.*, 119 Wis. 2d 722, 735-36, 351 N.W.2d 156, 163 (1984). Further, for a claims-made policy, the notice

6

requirement is a material part of the contract, and what constitutes proper notice is a question of law for the court to decide. *Koransky, Bouwer & Poracky, P.C. v. Bar Plan Mut. Ins. Co.*, 712 F.3d 336, 342 (7th Cir. 2013).

Arguments about the meaning of insurance policies or other contracts belong in briefs, not in expert reports. *RLJCS Enters., Inc. v. Prof'l Benefit Trust Multiple Emp'r Welfare Benefit Plan & Trust*, 487 F.3d 494, 498 (7th Cir. 2007). In *Scottsdale Insurance Co.*, for example, the district court barred opinions addressing the limitations of coverage based on terms of an insurance policy, interpretation of terms in a policy, whether bodily or personal injury occurred to trigger coverage, and whether an insurer denied coverage unjustifiably, among other things. 689 F. Supp. 2d at 1023-25.

Neither tower nor Fiserv challenges the credentials or qualifications of the others' experts; no one argues that an expert lacks knowledge, skill, experience, training, or education. Thus, the court will deem that requirement met as to each proffered expert. *See United States v. Moore*, 521 F.3d 681, 685 (7th Cir. 2008) ("A judge is not obliged to look into the questions posed by Rule 702 when neither side either requests or assists.").

Instead, the towers and Fiserv argues that the others' experts provide impermissible legal opinions and unreliable testimony.[3] Interestingly, each party challenges the others' experts as providing impermissible legal opinions while defending its own expert against a similar challenge. The court will assess each expert individually. The admissibility of one expert's testimony does not impact the admissibility of another's.

---

[3]Kochenburger and Newman are attorneys, but Lavelle is not. (*See* Doc. 103 Park Decl. Ex. A at 1; Doc. 106 Ex. D at 2; Doc. 110 Carleton Decl. Ex. C at 2.)

A.    Peter Kochenburger (Fiserv's Expert)

In his report, Peter Kochenburger identifies three formal opinions:

(a)    Claims-made policies purchased in successive years are intended to provide continuous coverage for covered claims, such that the interworking of multiple insurance towers should not serve to deny coverage to an insured.

(b)    Exclusions or terms such as the prior notice, prior wrongful acts, prior interrelated wrongful acts, and prior claims provisions are not designed to be read so expansively (i.e., so that future claims are deemed to relate back simply because they arise out of a particular service provided by the insured) that they reduce or eliminate the policyholders' incentives to purchase claims-made policies.

(c)    When two towers of insurers disagree as to which of them is responsible for coverage, it is appropriate industry practice that the two towers should make the insured whole and then work out any differences they may have regarding who has responsibility for coverage, particularly where some of the insurers in both towers are the same.

(Doc. 110 Carleton Decl. Ex. A ¶ 6.) At deposition, Kochenburger amended opinion (c) to replace "make the insured whole" with "protect the policyholder from a third-party claim." (*See* Doc. 110 Carleton Decl. Ex. C at 111.)

In addition to these three labeled opinions, Kochenburger's report contains several pages of background statements, some of which include descriptions of customs and practices in the insurance industry. (Doc. 110 Carleton Decl. Ex. A at ¶¶ 7-29.) For instance, he describes how series of primary and excess insurance are often referred to as towers and how excess insurers may issue "follow-form policies," "meaning they incorporated some of the essential elements of the primary policies, including coverages and exclusions." (*Id.* ¶ 9.) He describes the differences between claims-made policies and occurrence policies. (*Id.* ¶ 12.) And he discusses the history of claims-made policies, why

they offer advantages for insurers and policyholders, and safeguards to protect insurers' and policyholders' interests. (*Id.* ¶¶ 13-17.)

Both towers challenge Kochenburger's expert report and testimony. They focus their attack on Kochenburger's three formal opinions and a few other statements rather than his statements about background. Tower 2 does argue briefly that these background facts are not relevant because the instant dispute can be resolved simply by enforcing the contracts as written. (Doc. 110 at 10 n.4.) But at least at this stage the court finds that this background information could be helpful to a factfinder.

The court sees no issue with Kochenburger's statements based on customs and practices of the insurance industry. Rule 702 allows an expert to educate the factfinder about general principles, without applying the principles to the specific facts of the case. Fed. R. Evid. 702 advisory committee notes 2000 amendments. The background statements are not legal opinions and rest on methodology, though they do not require vigorous testing. Kochenburger indicated that in preparing his report he relied on "[n]umerous industry materials, including treatises, textbooks, underwriting guides, journal articles, statutes and case law." (Doc. 110 Carleton Decl. Ex. A ¶ 5(g).) Throughout his background statements Kochenburger provides twenty-five footnotes in which he cites supporting materials for these opinions or knowledge of customs and practices, and the insurers do not attack his sources. The sources include publications regarding Kochenburger's opinions or theories. Therefore, Kochenburger may testify as to the opinions included in his report regarding insurance industry customs and practices.

As for Kochenburger's three opinions that are summarized in paragraph 6 of his report, both towers attack them as legal opinions. Tower 1 also raises concerns concerning

9

reliability. With regard to all three opinions, Kochenburger states that he is providing "an industry perspective on the nature of claims-made policies." (Doc. 110 Carleton Decl. Ex. A ¶ 6).

The court finds that the opinion in paragraph 6(a) is based on insurance industry customs and practices rather than law. The Tower 2 Insurers contend that the intent of the parties must be derived from the language of the contract, which is a matter of contract interpretation for the court. But Kochenburger's opinion in paragraph 6(a) does not address the particulars of the contracts in this case. Instead, he describes the intent of insurers and policyholders generally respecting the purchase and sale of claims-made policies in successive years and how claims-made coverage is designed to operate.

The Tower 1 Insurers contend that whether continuous coverage exists is a legal question based on policy language. That is true, but Kochenburger does not opine that coverage exists under the policies. He opines only as to what parties buying or selling claims-made policies generally intend respecting back-to-back years of coverage.

Kochenburger's deposition testimony supports the court's conclusion. In discussing the opinion expressed in paragraph 6(a) he stated that he was "looking at the development of claims-made policies, the reasons why they were made, the reasons they should work, the concerns that the policyholders and insurers have." (Doc. 110 Carleton Decl. Ex. C at 92-93.) Moreover, Kochenburger is not opining on the ultimate legal questions of whether either of the towers before the court should pay up and, if so, which one; he focuses on how the insurance industry works in general.

The Tower 1 Insurers attack as a legal opinion Kochenburger's related statement, in the analysis section of his report, that "by purchasing claims-made insurance year after

year, a policyholder can maintain continuous liability coverage without gaps or fear that it did not have insurance when the act occurred." (Doc. 110 Carleton Decl. Ex. A ¶ 15.) However, Kochenburger does not purport to opine on what the policies require in this case but rather as to what the general practice is in the insurance industry. In doing so, he avoids stating a legal opinion.

This aspect of Kochenburger's opinion is reliable, as he reviewed industry customs and practices and took into account the history and purposes of claims-made policies in reaching his conclusion. Further, he supported his review with citations to particular authorities. (*See, e.g.,* Doc. 110 Carleton Decl. Ex. A ¶¶ 11-18 & nn.3-16.)

Reliable methodology can be based on experiences, treatises, and articles. *See Metavante Corp.*, 619 F.3d at 761. At deposition, Kochenburger indicated that in arriving at his opinions he considered

> the development of the claims-made policies, what the concerns were and how they're supposed to work together. So that, you know, the commentary, much of it written by, you know, insurers or their agents, you know, forms part of that custom and practice. . . . [T]he materials talk about, for example . . . prior acts coverage, and the need for awareness clauses, notice of potential claims. And how that, you know, sometimes how that might interact. And how – so much of the material that talks about not only the history of claims-made policies but . . . they don't talk about these policies in one year, they talk about how claims-made coverages work year after year.

(Doc. 106 Ex. C at 100.)

The Tower 1 Insurers contend that Kochenburger cites no specific custom or practice and conceded that custom or practice was a "nebulous concept" in the insurance industry. (*See* Doc. 106 Ex. C at 99.) However, customs and practices do not have to be formally adopted or named to be recognized. Hence, the court notes that Kochenburger admitted in response to a question that industry custom and practice "can" be a nebulous

11

concept, but also explained what he considered in determining industry custom and practice:

> [Y]ou consider the policy language, yes, you consider what insurance companies, some insurance companies may do, some may not do. But you also have to look at it from a broader angle in a sense of what a policyholder should expect, what do agents and brokers do, what, you know, what do regulators do, and what is the public policy behind it. All of that forms custom and practice of the industry. . . . I think sometimes it's too narrowly focused on, Well, this is what a couple of insurance companies do when they handle these claims, so that must be the way that it is. That's certainly relevant, but insurance for good reason in highly regulated as an important public function, and you can't look at – you know, you have to look at those issues, particularly in the context of liability, to also understand what is the custom and practice.

(Doc. 106 Ex. C at 98-99.) Thus, Kochenburger provides a reliable methodology for his opinions, regardless of whether others could come to different conclusions looking at the same information.[4]

Both towers' insurers argue that Kochenburger's opinion is unreliable and wrong because he admitted at deposition that it is possible that the North Carolina action claim may not fall within either tower's policies if notice was not made properly. But Kochenburger made such an allowance in his opinions, footnoting that for purpose of his analysis he assumed no other exclusions or unsatisfied conditions eliminated coverage. (Doc. 110 Carleton Decl. Ex. A ¶ 6 n.2.) He reiterated that qualified opinion in his rebuttal report, stating that "[a]ssuming no relevant exclusions in either year of coverage," a covered claim that was noticed as a potential claim in one year and subsequently made and reported in the subsequent year should not result in a situation in which the insurers

---

[4]Moreover, the Tower 1 Insurers' own expert, Thomas Newman, stated something similar at deposition—that a policyholder expects that if it has successive claims-made polices, a claim will not fall between two policy years so long as the policyholder complies with notice requirements in the policies. (*See* Doc. 109 Ex. C at 93, 107.)

for both years successfully deny the claim by pointing at each other. And he explained why insurers avoid such a situation. (Doc. 110 Carleton Decl. Ex. B ¶¶ 2-3.) Thus, his opinion is based on the situation of all other requirements for coverage being met; although there may be situations where exclusions apply or certain requirements — such as giving notice — are not met, in general coverage should fall within one of the two subsequent towers. Kochenburger's acknowledgment that there may be specific situations where coverage under both towers fails does not make his opinion unreliable.

Whether Kochenburger is wrong about specific customs and practices of the insurance industry is not the test for this court. The two towers may disagree with Kochenburger's conclusions and challenge them at trial, but at this stage his report goes through a methodology that the court finds acceptable. If Kochenburger's opinion is wrong, a party who disagrees may attack at trial; an order barring the testimony is not the proper remedy.

However, while the opinion in paragraph 6(b) is admissible, Kochenburger does venture elsewhere in his report into a couple legal opinions that must be excluded. The Tower 1 Insurers attack the statement related to paragraph 6(a), which Kochenburger made in his rebuttal to Newman's report: "If the First American Action does not fall within the 2009/10 tower then, based at least on the Notice of Potential Claims, it should within the 2008/09 tower." (Doc. 110 Carleton Decl. Ex. B ¶ 7.) This statement appears in Kochenburger's discussion of a Third Circuit case cited by Newman and distinguishing the present case. Contrary to all of the above-discussed opinions by Kochenburger, this *is* legal opinion. Whether the present case is distinguishable from the Third Circuit case and whether the North Carolina action indeed falls within Tower 1 or Tower 2 based on the

June 2009 notice and the policies' terms are questions of law for the court. Tower 1's motion in limine will be granted as to this statement alone.

The Tower 2 Insurers attack a statement that follows Kochenburger's citation to and quoting of various policy provisions: "These provisions should work together to provide seamless coverage so long as the policyholder maintains its claims-made policies over the relevant policy years." (Doc. 110 Ex. A ¶ 22.) This statement does venture into a legal opinion on the contracts at issue in this case. Thus, these two statements from paragraph 22 and rebuttal paragraph 7 must be excluded.

The opinion in paragraph 6(a) appears closer to a legal opinion, at first glance, as Kochenburger discusses the interpretation of policy terms or exclusions regarding prior notice and prior interrelated wrongful acts and other terms. However, his statement is *not* a legal opinion because Kochenburger does not opine on specific interpretation of the terms but rather on the general intent of insurers and policyholders regarding claims-made policies. His opinion concerns the effect of interpretation of policy terms on a policyholder's incentive to purchase a claims-made policy—that at some point if terms are read expansively, the incentive for acquiring a claims-made policy disappears.

Again, the opinion is reliable, for reasons similar to those discussed above. Kochenburger reviewed industry customs and practices in general and regarding claims-made insurance, reviewed the history of claims-made policies, discussed relevant policy language, assessed policy language as well as claims and related practices to come to his conclusion regarding the incentives underlying claims-made policies. (Doc. 110 Carleton Decl. Ex. A ¶¶ 11-25.) Again, the two towers may disagree with his conclusions, but his report goes through a methodology that the court finds acceptable.

The Tower 2 Insurers point to paragraphs 23 through 25 of Kochenburger's analysis section as venturing into legal opinion again. However, the court concludes they do not. Paragraph 23 discusses claims generally, and paragraph 24 is offered as an example of the point in paragraph 23. Similarly, paragraph 25 discusses claims and "relating back" generally. Although Kochenburger states that if "insurers interpreted the prior notice exclusion and other exclusions and terms as expansively *as insurers appear to do here*, there would be far less need (and premium) for subsequent years of claims-made coverage," his statement is not a direct interpretation of the contracts and is qualified by the word "appear." The court will allow the statement for now, but notes that any attempt at trial to have Kochenburger interpret the contracts at issue will not be allowed.

Next, the court finds that the opinion in paragraph 6(c), is not a legal opinion. Kochenburger opines on what he believes to be "appropriate industry practice," not on what is required by any policy language. Kochenburger's opinions on best practices are acceptable. At deposition, he did not refer to policy language as the basis for this opinion but instead said the issue "gets back to again the basic principles of liability insurance." (Doc. 110 Carleton Decl. Ex. C at 159.) The opinion is based on Kochenburger's review of industry customs and practices and the history of claims-made policies, with citations to supporting authorities. Kochenburger stated at deposition that he had seen many situations where insurers "step up" and eliminate the claim against the policyholder and "then work it out" between themselves. (*Id.* Ex. C at 156.) The Tower 1 Insurers argue that Kochenburger admitted at deposition that he had never seen a situation between two towers exactly like that in this case. (Doc. 106 (citing Doc. 106 Ex. C at 156).) But the fact

that an expert has not seen a situation identical to that on which he opines is not a basis for excluding his testimony as unreliable.

The Tower 1 Insurers contend that Kochenburger is wrong (and thus his opinion is unreliable) because he admitted at deposition that insurers can and do file declaratory judgment lawsuits and because he assumes that one or the other tower is responsible. But, again, whether Kochenburger's conclusion is correct is not a basis for striking his opinion. *See Stollings*, 725 F.3d at 765 (providing that the impeachability of an expert's conclusions does not make the testimony unreliable). Whether Kochenburger's assumptions are correct does not impugn his methodology and the towers can attack his conclusion at trial.

In sum, Kochenburger's opinions in paragraphs 6(a), (b), and (c) do not interpret the policies at issue. Instead, they address general practices in the insurance industry. Although two statements that venture into legal opinion must be excluded, the bulk of Kochenburger's reports is admissible.

B.     Thomas Newman (the Tower 1 Insurers' Expert)

Thomas Newman, the Tower 1 Insurers' expert, describes the scope of his report as opinion on (1) insurance industry custom and practice regarding claims reporting and handling under claims-made policies in successive years and (2) Kochenburger's expert report on that topic. (Doc. 103 ¶ 6.) Newman describes his methodology as setting forth relevant terms of the Tower 1 Insurers' policies, discussing claims-made coverage and notices of claims, setting forth the relevant facts as he understood them, and applying the general principles governing claims-made coverage to the facts of the case. (Doc. 103 ¶ 9.) Newman states that in reaching his opinions he relied on the Tower 1 and Tower 2 insurance policies, the pleadings in the North Carolina action, certain correspondence

between Fiserv and its insurers, certain responses to discovery in this case, and certain deposition testimony. Further, he relied on his general knowledge of insurance industry custom and practice, gained from his representation of insurance companies and extensive dealing with insurers, underwriters and claims handlers. Finally, he based his views on books and articles he authored on the subject of liability insurance, legal education programs regarding insurance that he attended or participated in, as well as law and professional journals dealing with liability insurance and claims handling. (Doc. 103 ¶ 58.)

In his report, Newman provides six paragraphs on claims-made coverage and notice provisions. (*Id.* ¶¶ 13-18.) Then, after setting forth what he considered the relevant facts and quoting from the June 2009 notice, he opines that "the 08-09 Tower insurers do not cover claims made during the 09-10 policy period unless sufficient notice of a potential claim was made during the 08-09 policy period under the terms of the 08-09 policies." (Doc. 103 heading before ¶ 32.) Newman follows that statement with twenty-five paragraphs of opinions and comments. (Doc. 103 ¶¶ 32-56.)

The Tower 2 Insurers ask that Newman's testimony be barred completely. (*See* Doc. 103 at 1.) They challenge whether he can provide opinions interpreting the terms and conditions of certain insurance policies and concerning the sufficiency of the June 2009 notice letter under policy notice requirements. The Tower 2 Insurers argue that these opinions are conclusions of law within the province of the court rather than an expert. According to the Tower 2 Insurers, Newman's opinions "are rife" with such legal conclusions. (Doc. 103 Br. at 5.) They point to his principal opinion that the June 2009 notice was insufficient to trigger coverage for the North Carolina action under Tower 1 and

specific statements in paragraph 36 of his report as well as at deposition. (Doc. 103 Br. at 5-6.)

At one point Fiserv argues broadly that Newman should be completely precluded from testifying at trial. (*See* Doc. 108 at 2.) However, Fiserv's motion and brief seek to prevent any opinion or testimony that (1) a strict compliance standard is to be used when interpreting an insurance claim provision; (2) Fiserv's notice in June 2009 was insufficient to capture the North Carolina action; (3) a provision in the Tower 1 excess policies "follows form" to a provision in the primary policy; and (4) Fiserv's claim for the North Carolina action may not be covered by either tower. (Doc. 107 at 1-2; Doc. 108 at 5-6.) Similar to the Tower 2 Insurers' arguments, Fiserv contends that Newman impermissibly seeks to interpret the policies and to apply that interpretation to the facts at hand to reach legal conclusions. Further, Fiserv invokes Fed. R. Evid. 403, arguing that the danger of the jury seeing Newman as more knowledgeable than the judge regarding the law and the danger of confusion between his testimony and jury instructions outweigh the value of his proposed testimony. Additionally, Fiserv argues that Newman's testimony is unreliable because it is unsupported by the factual record or industry practice and reflects views that are inconsistent with his conclusions outside of this litigation.

The motions will be granted, due in large part to Newman's venturing into legal opinion. Indeed, chunks of his report read like a brief by legal counsel. First, Newman's opinion indicates that a strict compliance standard is to be used. He states that a "notice of a claim or potential claim must comply strictly with the policy terms governing such notice" and that coverage "will depend on the insured's strict compliance with all terms and conditions of the policies." (Doc. 103 Park Decl. Ex. A ¶¶ 14, 39.) That the use of this

standard may be based on policy terms is suggested in paragraph 15 of Newman's expert report, where Newman references language from the National Union policy. But in paragraph 39, after mentioning the strict compliance standard, Newman states that under industry "custom and practice, if the insured fails to give the timely notice of circumstances and particulars of a potential claim that is required by the policies, it will result in no coverage." (Doc. 103 Park Decl. Ex. A ¶ 39.) The court cannot discern the basis for Newman's use of this standard; Newman fails to set forth the basis for or a methodology underlying his application of this standard by citing his authorities or particulars respecting industry custom and practice.[5] He merely says that it is so, and that is not enough.

Paragraph 36 of Newman's report is blatant legal opinion and must be excluded. Newman states:

> In my opinion, Fiserv's notice was specifically limited to notice of potential claims by its lender customers and does not "identify the particulars of the potential claim, including identifying the potential claimant(s), [the] likely basis for liability [and] the likely demand for relief" (Hiscox Policy, NU/FISERV 001312), subsequently made by First American, a title company and *not* one of Fiserv's lender customers.

(Doc. 103 Park Decl. Ex. A ¶ 36.) In reaching this opinion Newman assessed the June 2009 notice under the terms of the Hiscox policy. The opinion reaches beyond industry custom and practice to a legal conclusion regarding a determinative issue in this case. The Tower 1 Insurers argue that Newman opines based on his claims-handling experience, but the paragraph quotes policy language. Furthermore, the paragraph immediately preceding discusses Fiserv's entitlement to coverage if the June 2009 notice constituted sufficient

---

[5]In its opening and reply briefs, Fiserv argues that Newman's use of "strict compliance" differs from his previous writings, legal treatises, and case law. (*See* Doc. 118 at 9.) Whether Newman's use of a strict compliance standard is correct is not a basis for barring his testimony. The court's focus is on reliability; accuracy is a matter for cross-examination.

notice "under the terms of the 08-09 policies." (Doc. 103 Park Decl. Ex. A ¶ 35.) Paragraph 36 provides Newman's opinion on the issue discussed in paragraph 35; both speak of the June 2009 notice's sufficiency under policy provisions, not industry custom or practice.

The Tower 1 Insurers argue that the way in which a notice is interpreted by a liability insurance claim handler is not a legal conclusion. (Doc. 112 at 4.) But again, Newman's opinion is not limited to discussing industry custom and practice regarding claims handling; it addresses whether the June 2009 notice was sufficient under the language of the Hiscox policy. Thus, paragraph 36 must be excluded as improper legal opinion. Related opinions at deposition (*see, e.g.*, Doc. 109 Ex. C at 49 (agreeing that the June 2009 notice was "insufficient to capture" the North Carolina action) must be excluded as well.

Next, the Tower 2 Insurers and Fiserv challenge Newman's testimony at deposition that the National Union policy "incorporates the Hiscox policy" (or "follows form") (Doc. 109 Ex. C at 62, 111) as involving a legal opinion regarding the terms of the National Union policy. The Tower 1 Insurers point out that Newman did not offer that opinion in his report; instead, it was elicited by Fiserv's counsel during deposition questioning. The Tower 1 Insurers agree that whether the National Union policy incorporates the Hiscox policy is a question of contract interpretation for the court. They state that they will not offer such an opinion at trial. (Doc. 112 at 5.) Hence, this challenge is moot.

The Tower 2 Insurers contend that Newman offers contract interpretation when he says the phrase "to the extent possible" is given a "plain English meaning." (Doc. 109 Ex. C at 60.) However, Newman points to industry custom on this point. What that plain meaning *is* is a legal interpretation or opinion, but the industry custom itself is not.

Nevertheless, Newman cites to no source or methodology for determining this industry custom. He just says it is so, and that is not enough to make it reliable.

Further, Fiserv attacks as unreliable Newman's opinions that pursuant to industry custom and practice, coverage under the Tower 1 excess policies does not depend on and is not affected by subsequent policies (Doc. 103 Park Decl. Ex. A ¶ 33) and that "successive policies do *not* guarantee that the insured will be entitled to coverage under either year's policy" (*Id.* ¶ 38). According to Fiserv, Newman relies solely on an unpublished Third Circuit case, which at deposition he acknowledged had different facts than the present matter. The court reads the reference to the Third Circuit case in Newman's report as his support for the opinion in paragraphs 38 and 39, illustrating that circumstances may exist in which a policyholder is left without coverage even with successive claims-made policies. Nevertheless, the opinion is not otherwise supported, and the Tower 1 Insurers have not persuaded the court that this opinion is reliably made.

Many statements by Newman are unsupported—the statements are merely his say-so. (*See, e.g.*, Doc. 103 Park Decl. Ex. A ¶ 33 (discussing industry custom and practice but pointing only to policy language as support), ¶ 41 (discussing industry custom and practice without any noted support), ¶ 49 (disagreeing with Kochenburger's opinion without any cited support), ¶ 53 (stating that a claim can be "first made" during only one policy period without any cited support).) Some of Newman's opinions, like Kochenburger's, are about industry custom and practice, but they are not supported. The report lacks sufficient explanation of why Newman's experience or reliable, tested sources validate his conclusions. Newman cannot merely state his bare opinion to meet Rule 702's requirement

of reliability; his qualifications as an expert do not alone make his statements admissible at trial.

The Tower 1 Insurers contend that if Kochenburger's opinions are admissible at trial, then Newman's rebuttal opinions should be as well. However, the court notes Kochenburger, in the main, stayed on the firm ground of industry custom and practice and refrained from jumping into legal waters, while Newman did not, and Kochenburger supported his opinions with specific references.

The Tower 2 Insurers are correct that Newman's expert opinion is "rife" with legal conclusions and argument. For instance, the heading before paragraph 32 of Newman's report constitutes argument, paragraphs 35 and 56 read like a brief, paragraph 36 is legal opinion, paragraph 40 is legal opinion interpreting the Third Circuit case, paragraph 43 is legal opinion and argument, paragraphs 44 and 47 are legal opinions based on policy interpretation, and paragraph 45 is legal opinion regarding case law. Other legal opinions are expressed also, and they are too numerous for the court to parse out. Similarly, the unsupported statements are numerous. Consequently, the court will not scrutinize each sentence of the report and edit with a red pen. Therefore, Newman's entire report must be stricken.

C.      Paul Lavelle (the Tower 2 Insurers' Expert)

The Tower 2 Insurers named Paul Lavelle as their expert to rebut Kochenburger's and Newman's opinions. In separate sections of his report, Lavelle summarizes the policies in the two towers, quotes what he sees as pertinent policy language, and describes the June 2009 notice and the positions of the parties in this case. He then provides his "Expert Rebuttal" and five bullet-pointed "Conclusions."

The Tower 2 Insurers' first argument for admission of Lavelle's opinions is not persuasive. The insurers submit that if Kochenburger and Newman are allowed to testify, Lavelle should be too. However, as stated above, the court does not view the admissibility of each expert's testimony as affected by the admissibility of the others'. That one expert avoided legal interpretation does not justify admission of another's improper legal opinions.

The Tower 1 Insurers attack Lavelle's opinion in its entirety, citing impermissible legal conclusions and unreliability. Fiserv's motion points to Lavelle's opinions that (1) the North Carolina action relates back to the June 2009 notice, thereby precluding coverage under Tower 2; (2) an argument can be made that Fiserv was aware prior to the Tower 2 policy period of matters that could give rise to the claim; (3) insurers never satisfy the claims of an insured and later determine among themselves which tower is ultimately responsible; and (4) carriers in Tower 2 would have relied on the June 2009 notice during underwriting of the Tower 2 policies.

In supporting their attack on the ground that Lavelle is expressing a legal opinion, Fiserv and the Tower 1 Insurers highlight the following paragraphs:

> It is my expert opinion that Fiserv properly followed the terms of the Hiscox primary policy and had sufficient information to notify the 2008-2009 insurance tower of "claims" and "potential claims" that would likely lead to a "Loss" under the Hiscox primary policy.
> . . . .
> Clearly the Bank of America v. First American Title Insurance v. Fiserv matter submitted on August 18, 2010 (first notice to the 2009-2010 policy) concerns facts, allegations and wrongful acts that have as "a common nexus ANY (emphasis added) fact, circumstance, situations.......series of related facts" to the claims and potential claims noticed in the June 25, 2009 letter. In fact, it is my opinion, that the Bank of America v. First American Title Insurance v. Fiserv matter is related to the "claims" and "potential claims" noticed in the June 25, 2009 letter.

(Doc. 106 Ex. D at 8, 14-15 (latter alterations in original).) Also, they challenge Lavelle's related concluding statement that "[s]ubsequent claim submissions, including the Bank of America v. First American Title Insurance v. Fiserv matter, relate to the June 25, 2009 claim notice." (Doc. 106 Ex. D at 15.)

Like Newman's opinion regarding the June 2009 notice, these statements cross the line into legal opinion and interpretation of insurance policies.[6] Whether coverage exists under the Tower 1 or Tower 2 policies will depend upon the court's interpretation of the various policies' provision and whether the June 2009 notice was sufficient to meet the requirements of the Tower 1 policy regarding potential claims. Whether Fiserv met the requirements of the Hiscox policy depends on a legal interpretation of that policy and an assessment of the June 2009 notice in light of that legal interpretation. Lavelle's opinion is not grounded in customs and practices of the insurance industry. Instead, it rests on the language of the Hiscox policy. His support for the concluding statement quoted above indicates his reliance on policy terms: "The breadth of definition of 'potential claims' in the Hiscox policy, 'Interrelated Wrongful Act' in the ACE policy, Exclusion K and L of the ACE policy and the 'first made and reported' language support this conclusion." (Doc. 106 Ex. D at 15.) Expert testimony on interpretation of the policy is impermissible.

The Tower 2 Insurers maintain that Lavelle's opinion, unlike Newman's, should be admitted because it has evidentiary support, i.e., letters from Fiserv or its attorney to Hiscox (Tower 1 primary insurer) in the spring of 2010, in which Fiserv explained how

---

[6]The Tower 2 Insurers admit the similarity of the Newman and Lavelle opinions on this point: "[F]or the 08-09 Insurers to legitimately argue that Mr. Lavelle's opinion is impermissible legal opinion, they would have to concede that by Mr. Newman opining that the June 25 Notice did *not* capture the First American Action, Mr. Newman is also attempting to usurp the role of the Court." (Doc. 113 at 8.) The court finds that both experts are providing legal opinions.

numerous claims and the North Carolina action related back to the June 2009 notice. But in this court's view, the arguments by Fiserv's counsel to Fiserv's insurers in no way alter the conclusion that Lavelle is opining on whether the contents of the June 2009 notice sufficiently captured the North Carolina action under the terms of the Tower 1 policies. Because the court finds that these statements are legal opinion, and, therefore, excludable, arguments regarding unreliability and Fed. R. Evid. 403 need not be addressed.

Next, Fiserv seeks to exclude Lavelle's statement that "[a]rguments could be made" that Fiserv was aware of matters that could give rise to the claim prior to the Tower 2 policy period, and possibly the Tower 1 policy period. The body of Lavelle's report includes the following statement:

> Further, an argument can be made that the initial notice of the acts underlying the Bank of America v. First American Title Insurance v. Fiserv matter may go back to notices submitted prior to the 2008-2009 policy period.
> . . . .
> Additionally, upon review of several underlying letters to Fiserv from lenders and lender clients, an argument can be made that Fiserv clearly knew of claims or potential claims prior to the 2008-2009 policy period and, thus, Fiserv could reasonably expect further litigation.

(Doc. 106 Ex. D at 11.) The statements fall in a section titled "The Parties' Positions" in a subsection titled "Tower Carrier Response." Based upon the language actually used in the paragraphs, it is unclear whether Lavelle is stating his own view as to available arguments, or restating the various insurers' arguments. However, Lavelle repeats in his "Conclusions" section that "[a]rguments could be made that Fiserv was aware prior to the 2008-2009 policy period of matters that could give rise to a claim, but was certainly aware prior to the 2009-2010 policy period." (Doc. 106 Ex. D at 15.) Hence, these statements appear to be

Lavelle's personal views, which expound on arguments that may be raised by counsel. Consequently, they are not matters at to which Lavelle may testify at trial.

The Tower 2 Insurers contend that the statements are not speculation because they are supported by various letters, such as one from counsel for Hiscox addressing prior knowledge by Fiserv as possibly excluding coverage under Tower 1, and emails from Fiserv's Director of Risk Management expressing concern about litigation over QuickClose. But support for an argument does not transform it into an admissible opinion. If Lavelle cannot actually give an opinion but instead merely identify arguments, the testimony adds nothing useful for the trier of fact.

Next, Fiserv challenges as unreliable Lavelle's opinion that insurers never satisfy the claims of an insured and later determine among themselves which tower is ultimately responsible. As noted earlier, Fiserv's expert, Kochenburger, opines that it is appropriate industry custom and practice that two towers work together to make an insured whole (or protect the insured against a third-party claim) and then determine among themselves which tower was responsible. Lavelle disagrees in rebuttal:

> It is not the practice or custom in the professional liability discipline for two successive policy towers to agree to pay a claim "then work out any differences." This does not happen and is not the process for addressing a situation where two towers disagree about which tower should cover a Loss.
> Instead, if no agreement can be reached between the towers as to which carrier or tower owes coverage, a declaratory judgment action will normally be filed. In some instances a carrier or carriers may agree to fund a defense or settlement subject to a ruling or the insured may fund the defense until a determination is made. There is no practice of successive towers working out their disputes and making the insured whole.

(Doc. 106 Ex. D at 13.)

Fiserv contends that the opinion is not based on objective criteria. It indicates that other evidence regarding the practices at the Tower 2 Insurers (who hired Lavelle) contradicts Lavelle's opinion and that Lavelle had no good explanation at deposition for the contradiction. According to Fiserv, when an expert cherry-picks the material advantageous to his side's claims, his opinions are not based on good grounds. *See, e.g.*, *Fail-Safe LLC v. A.O. Smith Corp.*, 744 F. Supp. 2d 870, 891 (E.D. Wis. 2010) (Stadtmueller, J.) (stating that an expert's "cherry-picking" of evidence, without an explanation of why he chose the data he did, makes his methodology unreliable).

Fiserv's argument respecting a contrary view (Kochenburger's) does not make Lavelle's opinion unreliable, nor does it mean Lavelle cherry-picked the evidence. Whether the opinion is wrong is not the question at this time—reliability, not unassailability, is the requirement. Nevertheless, Lavelle fails to set forth any basis for this opinion in his report. He provides no explanation of the basis for his position; he describes no particular examples and he cites no literature on the matter. The statement is merely his bare conclusion and thereby unreliable.

Next, Fiserv challenges as unreliable Lavelle's opinion that carriers in Tower 2 would have relied on the June 2009 notice during underwriting of the Tower 2 policies. Lavelle stated:

> A critical factor . . . when discussing successive insurance towers is the underwriting process. A new carrier on a risk (the second year in successive towers) insists on reviewing claim histories on insureds they wish to underwrite and potentially insure. A claim history is a key factor in helping assess future risk. In fact, both Endurance and XL requested and received a claims bordereau report from Fiserv prior to agreeing to bind coverage in the 2009-2010 policy period. This bordereau report identified the claims and potential claims noticed in the June 25, 2009 letter.

> Having a claim or potential claim previously reported will give the carriers in the second year comfort that claims or potential claims reported under the previous policy cannot be first made and reported in the second year. Additionally, an Insured could potentially gain relief in the form of decreased premiums because subsequent matters will stay under the first reported tower due to their relation to a prior notice given to the preceding tower.

(Doc. 106 Ex. D at 13.) These statements discuss insurance industry customs and practices, which appear at first glance to be acceptable, but Lavelle concludes in particular as to this case: "Carriers in the 2009-2010 towers of insurance would have relied on the June 25, 2009 letter as a broad notice of acts and claimants in the underwriting of the 2009-2010 policy, which letter was consistent with the bordereau information provided to those insurers." (Doc. 106 Ex. D at 15.)

According to Fiserv, the final opinion is speculation; moreover, the Tower 2 Insurers were aware of the June 2009 notice yet specifically included QuickClose in covered services. Relatedly, the Tower 1 Insurers attack Lavelle's opinion of underwriting as being a "critical factor" as irrelevant because at deposition Lavelle admitted that the underwriting process was not relevant in this particular case to the issue of whether the June 2009 notice was sufficient to trigger coverage under Tower 1.

Lavelle gave no support for his conclusion in the written report. Further, he admitted at deposition that he did not work to gather information to determine whether the Tower 2 underwriters relied upon the June 2009 notice:

Q    When you say the '09-'10 Tower insurers would have relied on the June 25, 2009 letter, are you saying that they did rely?

A    I don't know if they did, I don't know what the underwriters were looking at.

Q    Did you, in the course of your work in this case, ask to speak with any of the underwriters who were responsible for the '09-'10 policies at issue?

28

A      No, I did not.

(Doc. 109 Ex. E at 120-21.) Moreover, Lavelle testified that although information from the underwriting process is often critical in a claims analysis, it actually had no effect on his evaluation of the June 2009 notice in the present case. (*Id.* at 288-289.) Therefore, the court agrees with Fiserv and the Tower 1 Insurers that the opinion specific to the facts of this case is unsupported and unreliable. Similarly, the general statements about underwriting are not supported by any explanation of the basis for the opinion other than that the Tower 2 Insurers asked for a bordereau report (and Lavelle does not describe what that is). Reliable methodology for these opinions has not been tendered to the court.

The Tower 1 Insurers cite as irrelevant Lavelle's opinion about multiple retentions. In the section of "The Parties' Positions" under the subtitle of "The Reed Smith Coverage Letter," Lavelle discussed a March 2010 letter from Fiserv's counsel, Matthew Schlesinger, to Hiscox, in which Schlesinger made certain statements regarding relation back of certain claims to the June 2009 letter. Lavelle then wrote:

> It is my opinion that Mr. Schlesinger's statements were to assure that Hiscox did not take the position that the claims submitted in the June 25, 2009 letter and subsequently noticed matters were unrelated so that his client, Fiserv, would face a situation where Hiscox applies a separate Retention ($5,000,000—Hiscox policy) for each and every matter. I concur with Mr. Schlesinger's conclusion that the claims submitted in the June 25, 2009 letter and subsequent submissions should not be subject to separate Retentions because they are related. Mr. Schlesinger correctly stated that "in actuality, all the claims are related."

(Doc. 106 Ex. D at 10.)

The Tower 2 Insurers concede that the number of retentions has no bearing on whether the June 2009 notice was sufficient to provide notice of the North Carolina action under the Tower 1 policies. Thus, the opinion regarding multiple retentions will be

excluded. Regardless, the Tower 2 Insurers maintain that Lavelle's agreement with Schlesinger as to the claims being related is permissible. However, this position relates to the sufficiency of the June 2009 notice and is impermissible legal opinion.

Like Newman's report, Lavelle's report is "rife" with legal opinions, unsupported, and unreliable. Moreover, the problem opinions in the report are too numerous to parse. Therefore, the entire report will be excluded.

## CONCLUSION

For the reasons set forth above,

IT IS ORDERED that the motions in limine challenging the testimony of Peter Kochenburger (Docs. 104, 105) are granted in part and denied in part as set forth above, the motions in limine challenging the testimony of Thomas Newman (Docs. 103, 107) are granted, and the motions in limine challenging the testimony of Paul Lavelle (Docs. 105, 107) are granted.

Dated at Milwaukee, Wisconsin, this 14th day of April, 2014.

BY THE COURT

/s/ C. N. Clevert, Jr.
C. N. CLEVERT, JR.
U. S. DISTRICT JUDGE