UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

FISERV SOLUTIONS, INC.,

        Plaintiff,

        v.                                Case No.  11-C-0603

ENDURANCE AMERICAN SPECIALTY
INSURANCE COMPANY, XL SPECIALTY
INSURANCE COMPANY, NATIONAL UNION
FIRE INSURANCE COMPANY OF PITTSBURGH PA,
and CONTINENTAL CASUALTY COMPANY,

        Defendants.

---

### DECISION AND ORDER GRANTING TOWER 1 MOTIONS FOR SUMMARY JUDGMENT (DOCS. 133, 143), DENYING TOWER 2 MOTION FOR SUMMARY JUDGMENT (DOC. 137), GRANTING IN PART AND DENYING IN PART FISERV'S MOTION FOR SUMMARY JUDGMENT (DOC. 139), AND SETTING A STATUS CONFERENCE

Policyholder Fiserv Solutions, Inc. sues four insurers under various claims-made policies for coverage of funds Fiserv paid to settle litigation in North Carolina.  In that action, Bank of America sued First American Title Insurance Company, which then sued Fiserv in a third-party complaint.  All parties move for summary judgment.

Summary judgment is proper if the depositions, documents or electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers or other materials show that there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a), (c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the initial burden of demonstrating it is entitled to summary judgment.  *Celotex*, 477 U.S. at 323.  Once this burden is met, the nonmoving party must designate specific facts to support or defend each element of its cause of action, showing that there is a genuine issue for trial.  *Id.* at

322-24. In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The mere existence of a factual dispute does not defeat a summary judgment motion; there must be a genuine issue of material fact for the case to survive. *Id.* at 247-48. "Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997). Failure to support any essential element of a claim renders all other facts immaterial. *Celotex*, 477 U.S. at 323. To establish that a question of fact is "genuine," the nonmoving party must present specific and sufficient evidence that, if believed by a jury, would support a verdict in its favor. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 249.

Because the parties in this case have filed cross-motions for summary judgment, many facts are undisputed. When no genuine issue of material fact exists, the sole question is whether the moving party is entitled to judgment as a matter of law. *Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 978 (7th Cir. 1996). Nevertheless, when two parties have moved for summary judgment, both are required to show that no genuine issue of material fact exists, taking the facts in the light most favorable to the party opposing each motion. *See Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt*, 700 F.2d 341, 349 (7th Cir. 1983).

COMMENTS ON LOCAL SUMMARY JUDGMENT PROCEDURE

Civil L.R. 56(b)(1) requires each summary-judgment movant to file statements of material facts to which all parties have stipulated plus statements of proposed material facts as to which the movant contends there is no dispute. The statements shall consist

2

of "short numbered paragraphs, including within each paragraph specific references" to the evidence. Civil L.R. 56(b)(1)(C)(i). Opposing parties then respond to each proposed factual statement, "including, in the case of any disagreement, specific references to the affidavits, declarations, parts of the record, and other supporting materials relied upon." Civil L.R. 56(b)(2)(B)(i). The opponent may file additional statements of proposed facts, again consisting of "short numbered paragraphs," that the party believes require the denial of summary judgment. The movant in reply then responds to the additional facts in the same way the opposing party responded to the initial proposed facts. Civil L.R. 56(b)(3)(B). Any statement that is not controverted properly is deemed admitted for summary-judgment purposes. Civil L.R. 56(b)(4).

In this case, the court encouraged the parties to submit a set of stipulated facts to the extent possible, expecting that they could agree on matters such as insurance-policy language and the contents of notice letters. A document titled "Joint Stipulation of Facts," was filed, but the bulk of the stipulated "facts" are actually agreements respecting the identification and admissibility of documents. For instance, paragraph 19 reads: "On June 25, 2009, prior to the expiration of the policy period for the 08-09 Tower, Fiserv submitted to the 08-09 insurers a letter entitled, 'Notice of Potential Claims.' (Attached hereto as Stip. Ex. 21 is a true and correct copy of the June 25, 2009 letter entitled, 'Notice of Potential Claims,' Bates-labeled FISERV-001213977–93[.])" (Doc. 122, ¶ 19.) And paragraph 24 reads: "On June 9, 2010, Hiscox, the primary 08-09 insurer, sent a letter responding to Fiserv's March 9, 2010 letter. (Attached hereto as Stip. Ex. 28 is a true and correct copy of the letter from L. Kamaiko to M. Schlesinger (June 9, 2010), Bates-labeled FISERV-001285175–209[.])" (Doc. 122, ¶ 24.)

3

The stipulations concerning exhibits assists the court regarding admissibility of evidence and by providing the pertinent documents in one set of binders. The court simply notes that the parties likely could have stipulated to much more. For instance, proposed statements of fact from multiple parties set forth the same language from the Hiscox and National Union policies and from the potential-claims notice (described below). The court urges the parties (not just those in this case, but in all cases) to seek stipulations on the content of or text within exhibits as well as the dates and admissibility of the exhibits. It truly assists decision making. Here, the court had to sift through twenty-two different documents matching hundreds of proposed facts and responses—with several of the proposed facts quoting or paraphrasing identical language from the same documents that were submitted by separate parties.

Though the above is merely a suggestion, many of the responses to statements of proposed fact require additional comment. National Union, in response to many statements of fact (for instance, most proposed statements of fact by Endurance and XL), stated that the terms and conditions of a particular document speak for themselves and that the proposed statement of fact is disputed "to the extent inconsistent therewith." (*See, e.g.,* Doc. 173, ¶¶ 4- 15.) For example, National Union, in response to a quote of a Hiscox policy provision in proposed fact 13 in Document 152, responded: "NUFIC states that the terms and conditions of the Hiscox Policy speak for themselves, and disputes ¶ 13 of Endurance and XL's Statement of Additional Facts to the extent inconsistent therewith. NUFIC further states that ¶ 13 only refers to a portion of the Hiscox Policy, and the policy must be read as a whole." (Doc. 173, ¶ 13.) Such a response is not a proper response. It fails to answer whether the statement is accurate and fails to direct the court to a specific

4

disagreement—which is the point of the statements of proposed fact. Either the quote is correct or it is not. National Union should have responded with an admission or a denial and, if the latter, a correction of the language. (See, e.g., Continental's response in document 179, paragraph 29, which provides the full quote when Continental thought a partial quotation was incomplete.) Instead, National Union essentially told the court: "judge, go look at the whole document and figure out how we object." (The Hiscox policy, by the way, is forty-six pages. (Doc. 122, Ex. 6.)) The court should not be expected to read four insurance policies and guess what these parties are disputing. Similarly, statement 52 in Document 152—that a witness testified using quoted language—merited an admission or denial, not the by-then usual refrain that the deposition testimony "speaks for itself," is disputed "to the extent inconsistent therewith," and "must be read as a whole." Again, either the quote was correct or it was not. Because responses such as these avoid the whole point of statements of proposed fact, the court has generally disregarded them.[1]

Notably, National Union was not the only party to provide such (non)responses to statements of proposed fact. Continental provided similarly unhelpful responses to quotations from letters or emails. (*See* Doc. 166, ¶ 5 (responding to quotations with "Continental admits only that Dave Stokes wrote to Steve Winkler on October 19, 2006. The correspondence speaks for itself and must be read as a whole.") Fiserv, too, at times fell into this type of response. (*See* Doc. 176, ¶¶ 40–48 ("Undisputed that the referenced document says what it says. FLS disputes these proposed facts to the extent they

_____

[1]Nevertheless, the court did not necessarily accept a party's paraphrasing or interpretation of language in a document. In many instances regarding facts proffered by all of the parties, the court has gone back to the original document rather than accept a party's interpretation of it. It just would have been better for the parties to identify the differences and present the accurate quotations rather than leaving it to the court to work through.

mischaracterize the referenced document which speaks for itself."); *see also id.* ¶ 37.) Again, the court disregarded such nonspecific and unhelpful responses.

Next, Fiserv objected to various statements of proposed fact from Endurance and XL because they were not limited to a single factual proposition. However, though a prior version of the local rules limited each proposed finding of fact to one factual statement, the present version of the local rules does not. As stated above, the present local rule requires only short, numbered paragraphs. Civil L.R. 56(b). The court has reviewed Endurance and XL's proposed statements of fact and concludes that they do not violate the rule.

Interestingly, even though the court has sifted through hundreds of proposed material facts and responses, it does not appear that any of them set forth some important language from the 2009-2010 policies. In their briefs, Fiserv and Endurance and XL discuss the ACE Westchester policy's "prior notice exclusion" and definition of "Interrelated Wrongful Act." Yet the court did not find any proposed findings of fact setting forth that policy language. Perhaps the court missed it. But factual references in briefs must include cites to the stipulation or proposed statement of fact, and for some quotations of policy language Endurance and XL cite only to a page number in the parties' joint exhibit 16 rather than to a statement of fact, suggesting that there was no such proposed fact. (*See, e.g.*, Doc. 137, Ex. 2 at 5–7.) Without pertinent language having been presented properly, the court could deny both summary judgment motions. However, neither party objected to the other's failure, Endurance and XL pointed to and quoted pertinent policy language in their brief, and the court can confirm the provisions in exhibit 16. Therefore, the court will address the merits. But again, a better presentation of the facts would have made the

6

court's task easier.  Finally, the court has disregarded statements of proposed fact that rely upon the two experts whose opinions have been rejected.

GENERAL UNDISPUTED FACTS

The following facts describe the general background of this case.  Specifics regarding policy language and various notices will be discussed later.

On March 5, 2010, Bank of America (BOA) sued United General Title Insurance Company and First American Title Insurance Company in state court in North Carolina: *Bank of America, N.A. v. United General Title Insurance Co.*, No. 10-CVS-5415 (N.C. Super. Ct.) (the "BOA action").  (Doc. 152, ¶¶ 32, 47; Doc. 122, ¶ 1; Doc. 135, ¶ 18; Doc. 146, ¶¶ 10, 11.)  On April 1, 2010, First American, in turn, filed a third-party complaint against Fiserv (the "First American action").  (Doc. 152, ¶ 47; Doc. 122, ¶ 1; Doc. 146, ¶ 11.)  The BOA action and the First American action arose out of Fiserv's "QuickClose Lien Protection Insurance Program."  (Doc. 122, ¶ 2; *see* Doc. 146, ¶ 1.)

Fiserv (actually Fiserv Loan Servicing (FLS), a division or subsidiary of Fiserv) offered a number of loan-closing-related services, from traditional title agency services (such as closings, full title searches and full appraisals) to automated property appraisals and more.  (Doc. 141, ¶ 23.)  Fiserv devised QuickClose to permit lenders to close home equity loans without waiting for a title search and title policy.  (Doc. 135, ¶ 13; Doc. 161, ¶ 13; Doc. 127, Ex. 47 at 25-30.)  QuickClose allowed lenders to forego a traditional preclosing title search to shorten the preclosing process, while still receiving insurance protection for undisclosed title issues that might affect the lender's lien priority.  (Doc. 146, ¶ 2; Doc. 153, ¶ 2.)  QuickClose involved borrowers, lenders, title insurers, and a title agent.  (Doc. 146, ¶ 3; Doc. 153, ¶ 3.)  The borrower would apply for the loan, the lender

7

would process the loan application and credit report, Fiserv acted (among other things) as the title agent, and the title insurer would issue lien-protection insurance (LPI) to protect the lender against losses arising from undisclosed title issues. (Doc. 146, ¶ 4; Doc. 153, ¶ 4.) The LPI policies insured against losses suffered by lenders if their loans to defaulting borrowers did not have the lien priority that the lenders expected them to have. (Doc. 135, ¶ 30.) Fiserv provided the certificates of insurance to lenders showing a loan was added to the program. (Doc. 141, ¶ 25.)

BOA was a lender involved in QuickClose, and First American was an LPI insurer. (Doc. 146, ¶ 8; Doc. 160, ¶ 8.) Fiserv entered a Master Services Agreement and Statement of Work (SOW) with BOA. Separately, Fiserv entered a National Agency Agreement with First American. (Doc. 146, ¶ 9; Doc. 153, ¶ 9; Doc. 160, ¶ 9.)

In QuickClose, Fiserv acted as an agent for First American and other title insurers in the issuance of LPI policies to lenders, among other things. (Doc. 135, ¶¶ 13, 30; Doc. 152, ¶ 13; Doc. 161, ¶¶ 13, 30.) Fiserv's duties included verifying ownership, documenting the property description, recording the lien, issuing a certificate of insurance, collecting premiums, and transmitting to First American information regarding the transactions to effect coverage. (Doc. 135, ¶ 30; Doc. 146, ¶ 5; Doc. 153, ¶ 5.)

If, after borrower default, a home equity credit line was found not to be in the intended lien position and the collateral was unavailable to the lender, the lender would submit a claim to the title insurer, such as First American, for coverage. (Doc. 141, ¶ 26.) Fiserv facilitated the submission of lender claims to First American. (Doc. 141, ¶ 31.) Fiserv (possibly acting with the title insurers) developed a claim submission form that BOA used to report LPI claims to Fiserv, which would package those claims and present them

8

to the title insurer.  (Doc. 146, ¶ 6; Doc. 153, ¶ 6; Doc. 160, ¶ 6.)  For its services to lenders and First American, Fiserv was paid a fee.  (Doc. 141, ¶ 32.)

If Fiserv determined that it made a recording-type mistake under QuickClose, it attempted to correct or reform it.  (Doc. 141, ¶ 29.)  Fiserv's former head of claims explained that Fiserv's QuickClose errors and omissions "wouldn't even register a fraction of a fraction in terms of the total number of transactions.  I mean, it's negligible."  (Doc. 141, ¶ 30; Doc. 128, Ex. 52 at 240.)

Fiserv offered QuickClose services for approximately seven years, from 2001 to December 2007.  (Doc. 122, ¶ 3.)  During one fiscal year, QuickClose business represented 37% of revenue of Fiserv's subsidiary FLS.  (Doc. 135, ¶ 29; Doc. 146, ¶ 7, Doc. 153, ¶ 7.)

QSS was a replacement service for QuickClose.  (Doc. 135, ¶ 15.)  Fiserv created QSS after First America ceased issuing new QuickClose LPI coverage or withdrew Fiserv's authority to issue QuickClose certificates in December 2007.  (Doc. 141, ¶¶ 34, 35; Doc. 154, ¶ 34.) QSS involved contract-performance insurance rather than indemnity insurance. (Doc. 127, Ex. 47 at 89-95.)  Under QSS, Fiserv offered certain lien and recording-related services to the lenders, but if a lien was found not to be in its intended position after default, the lender would make a claim against Fiserv, rather than a lien protection insurer. (Doc. 162, ¶ 7.)  Fiserv procured insurance to cover QSS lien-position claims from a new form of coverage insurer.  (Doc. 162, ¶ 9; Doc. 170, ¶ 9.)  At least one other difference between QuickClose and QSS was that QSS required a preclosing vesting report.  (Doc. 137, Ex. 2, ¶ 19; Doc. 166, ¶ 19; Doc. 159, ¶ 19.)

9

ValueGuard was a program involving an insurance product that protected against loss resulting from computerized appraisals (performed by Fiserv in connection with a product called "Home ValueBot") if the appraisal turned out to be overstated. VSS was a replacement service for ValueGuard. (Doc. 135, ¶ 15.)

Fiserv was insured under various claims-based policies[2] during the period leading up to and including the filing of the BOA action and First American action. Fiserv's insurance was set up in yearly "towers," with policies running from July 1 to July 1. (*See* Doc. 122, ¶ 7.) Fiserv's broker was Lockton Financial Services. (Doc. 122, ¶ 5.)

The 2008-2009 insurance program ("Tower 1") included policies from Lloyd's Syndicate 33, managed by Hiscox Syndicates Limited as the primary insurer; National Union Fire Insurance Company, the first excess insurer; Continental Casualty Company, the second excess insurer; and ACE American Insurance Company, the third excess insurer. (Doc. 122, ¶ 4; Doc. 152, ¶ 64.) National Union issued to Fiserv Policy No. 00-623-70-91, providing insurance coverage in excess of the underlying limits of the Hiscox policy, and Continental issued to Fiserv Policy No. 287198208-01, providing insurance coverage in excess of the Hiscox and National Union policies. The National Union and Continental polices covered the policy period July 1, 2008, to July 1, 2009. (Doc. 122, ¶¶ 9, 10.) The pertinent policy limits are as follows:

| | |
|---|---|
| Hiscox policy | $20 million in excess of a $5 million retention |
| National Union policy | $10 million |
| Continental policy | $10 million. |

---

[2]Claims-based or claims-made policies provide coverage for claims made during the policy period. *XL Specialty Ins. Co. v. Perry*, No. CV 11-02078-RGK (JCGx), 2012 WL 3095331, *3 (C.D. Cal. June 27, 2012); *Am. Med. Sec., Inc. v. Exec. Risk Specialty Ins. Co.*, 393 F. Supp. 2d 693, 697 (E.D. Wis. 2005); *Zunenshine v. Exec. Risk Indem., Inc.*, No. 97 Civ. 5525(MBM), 1998 WL 483475, *1 n.1 (S.D.N.Y. Aug. 17, 1998).

10

(Doc. 146, ¶¶ 25, 26; Doc. 157 at 33, ¶ 1.)  Hiscox's policy limit was fully exhausted by other claims.  (Doc. 122, ¶ 8; Doc. 146, ¶ 27.)   ACE American was sued in this action but settled with Fiserv; all claims against ACE American were dismissed.  (Doc. 100; Doc. 146, ¶ 27.)  Therefore, the only remaining Tower 1 insurers in this litigation are National Union and Continental.  (Doc. 146, ¶ 28.)  Fiserv paid all premiums due on the Tower 1 policies were paid by Fiserv.  (Doc. 122, ¶ 11.)

The 2009-2010 insurance program ("Tower 2") included policies from Westchester Fire Insurance Company ("ACE Westchester") as the primary insurer; Endurance American Specialty Insurance Company, the first excess insurer; XL Specialty Insurance Company, the second excess insurer; Westchester Surplus Lines Insurance Company, the third excess insurer; and Illinois National Insurance Company, the fourth excess insurer.  (Doc. 122, ¶ 12; Doc. 135, ¶ 11; Doc. 152, ¶ 11; Doc. 161, ¶ 11.)  ACE Westchester issued the primary layer of coverage in Tower 1, effective July 1, 2009, to July 1, 2010, with an Extended Reporting Period of July 1, 2010 to December 11, 2015.  The ACE Westchester primary policy was a claims-made policy.  (Doc. 122, ¶ 14.)  Endurance issued to Fiserv Fulfillment Services, Inc. dba Fiserv Lending Solutions, Policy No. PEL 10001493300, which provides insurance coverage in excess of the "Underlying Limit of Liability" of the ACE Westchester Primary Policy. (Doc. 122, ¶ 16.)   XL issued to Fiserv Fulfillment Services, Inc., Policy No. ELU112306-09, providing insurance coverage in excess of the ACE Westchester and Endurance policies.  (Doc. 122, ¶ 17.)  The pertinent policy limits are as follows:

|  |  |
| --- | --- |
| ACE Westchester policy | $10 million in excess of a $25,000 retention |
| Endurance policy | $15 million |
| XL Specialty policy | $15 million. |

11

(Doc. 146, ¶¶ 38, 39.)  ACE Westchester settled with Fiserv, and all claims against it were dismissed.  (Doc. 122, ¶ 15.)  As part of their settlement, ACE Westchester and Fiserv agreed that the ACE Westchester policy was exhausted.  (Doc. 146, ¶ 58.)  All claims against Westchester Surplus and Illinois National were dismissed as well.  (Doc. 122, ¶ 12.)  Thus, the only Tower 2 insurers remaining in this litigation are Endurance and XL.  Fiserv paid all premiums due on the 09-10 Tower.  (Doc. 122, ¶ 18.)

On June 25 and 26, 2009, prior to the expiration of the Tower 1 policies, Fiserv notified the Tower 1 insurers of claims made by four banks (TD Banknorth, Sovereign, Wachovia, and TCF Bank) concerning alleged damages from use of Fiserv's QuickClose, QSS, and ValueGuard programs. (Doc. 121, ¶ 20; Doc. 123, Ex. 22 at 2.)  In addition, on June 25, 2009, Fiserv submitted to the Tower 1 insurers a letter entitled, "Notice of Potential Claims."   (Doc. 122, ¶ 19.)

By letter dated March 4, 2010, Fiserv provided notice to the Tower 1 insurers of a BOA demand of over $100 million, presented to Fiserv through a confidential PowerPoint presentation.  (Doc. 152, ¶ 24; Doc. 122, ¶ 1; Doc. 137, Ex. 2, ¶ 22.)  In the letter Fiserv reminded Hiscox of the letters from June 2009:

> Recently, Bank of America made a specific written demand concerning damages it allegedly has suffered as a result of errors or omissions in the provision of services by Fiserv under the QuickClose and QSS programs.  Among other things, Bank of America alleges that Fiserv:  (1) breached its contractual obligations by failing to obtain appropriate insurance, (2) negligently performed services under the program, including but not limited to, failing to record liens in Bank of America's desired position, resulting in losses to Bank of America; and (3) misrepresented the program and the insurance that would be provided when it sold the program to Bank of America.  These allegations are similar in nature to the claims made by Sovereign and Wachovia, about which Fiserv previously notified Hiscox about [sic] on June 25, 2009.

12

(Doc. 152, ¶ 25; Doc. 138, Ex. T at LOC-FISERV-001299200.)

BOA filed the BOA action against First American on March 5, 2010, and First American filed its third-party action against Fiserv on April 1, 2010. (Doc. 152, ¶¶ 32, 47.) Fiserv notified the Tower 1 insurers of the First American action on April 9, 2010. (Doc. 122, ¶ 23; Doc. 123, Ex. 25; Doc. 135, ¶ 20; Doc. 152, ¶ 51; Doc. 146, ¶ 45.) The notice stated that the allegations in the First American action "are similar in nature to the claims made by Bank of America (and other Lenders) that Fiserv previously notified Hiscox." (Doc. 152, ¶ 51; Doc. 123, Ex. 25 at FISERV-001291512.)

Hiscox responded to the notice of the First American action by reserving its rights to deny coverage under its primary policy. (Doc. 135, ¶ 23.) National Union issued a reservation of rights letter on August 6, 2009. On the other hand, Continental did not issue a reservation of rights letter. (Doc. 62, ¶ 33; Doc. 179, ¶ 33.)

On or effective June 15, 2010, BOA and Fiserv executed a "tolling agreement," whereby claims of BOA against Fiserv would be tolled for up to two years. (Doc. 152, ¶¶ 26-27; Doc. 138, Ex. U.) Hiscox was notified of the agreement prior to its execution but did not object. (Doc. 152, ¶¶ 27-28; Doc. 154 at 33, ¶¶ 29, 30.) However, Fiserv did not seek consent of any of the Tower 2 insurers. (Doc. 137, Ex. 2, ¶ 24; Doc. 154 at 33, ¶ 29.)

No later than August 18, 2010, Fiserv notified the Tower 2 insurers of the First American action. (Doc. 135, ¶ 21; Doc. 161, ¶ 21; Doc. 146, ¶ 46; Doc. 160, ¶ 46.) In a December 13, 2010 letter, ACE Westchester stated that it would defend Fiserv in the First American action under its primary policy, subject to a reservation of rights. (Doc. 122, ¶ 29; Doc. 135, ¶ 22; Doc. 154 at 44, ¶ 81.) By July 29, 2011, ACE Westchester took the position that the First American action fell within Tower 1 but agreed to pay for Fiserv

13

expenses in the First American action with the right to recoup them. (Doc. 154 at 45, ¶ 84; Doc. 176, ¶ 84; Doc. 126, Ex. 39 at FISERV-001229711 to FISERV-001229712.) On August 11, 2011, ACE Westchester issued its first check for a portion of the defense costs of the First American action. (Doc. 122, ¶ 36.)

In a letter dated July 18, 2011, Endurance's counsel adopted ACE Westchester's coverage reservations, indicating that it learned in mid-June 2011 that Fiserv had noticed Tower 1 in June 2009 and expressing concerns as to whether the claim belonged under the Tower 1 program. (Doc. 154 at 45, ¶ 83; Doc. 125, Ex. 38.)

In the summer and fall of 2011, Fiserv engaged in a multi-phase mediation concerning the BOA action and the First American action. (Doc. 122, ¶ 37.) During July 2011, Fiserv held calls and meetings with the Tower 1 and Tower 2 insurers in which Fiserv provided information on the mediation. (Doc. 122, ¶ 38.) From July through October 2011, Fiserv provided the Tower 1 and Tower 2 insurers with mediation briefs, PowerPoint presentations, and demands and responses as exchanged in the mediation. Fiserv also provided the insurers with the pleadings in the First American action. (Doc. 122, ¶ 39.)

In November and December 2011, at the end of a final three-day in-person mediation session, the BOA action and the First American action were resolved. (Doc. 122, ¶ 44; Doc. 135, ¶ 25; Doc. 152, ¶ 57.) The Tower 2 insurers attended most of the November 2 to 4 mediation but left before settlement was reached. (Doc. 141, ¶ 79.) Fiserv kept the Tower 1 and Tower 2 insurers apprised of certain mediation demands and counteroffers. (Doc. 141, ¶¶ 80, 81.)

In December 2011, Fiserv and First American entered a settlement, and Fiserv and BOA entered a separate settlement agreement. (Doc. 152, ¶¶ 57, 58; Doc. 148 Exs. A,

14

B.)  Fiserv agreed to pay First American a multimillion-dollar amount that impacts the first two excess insurers under either tower.  (*See* Doc. 148, ¶ 1.)  The Tower 1 and Tower 2 insurers did not object to the settlement between Fiserv and First American.  (Doc. 122, ¶ 45.)  However, no insurer agreed to provide coverage.  (Doc. 122, ¶ 45.)  The remaining insurers from both towers have denied any coverage for Fiserv's settlement payment in the First American action.  (*See* Doc. 122, ¶ 45.)

On June 22, 2011, Fiserv filed the present case against the Tower 2 insurers.  Fiserv amended the complaint on January 31, 2012, to add the Tower 1 insurers.

## DISCUSSION

As an initial matter, the court rejects certain arguments, clearing the way for the main issues.  First, various insurers contend that Fiserv has admitted that coverage belongs in one or the other tower, dooming its case against the insurers in the other tower.  For instance, the Tower 2 insurers contend that Fiserv, in its briefs, admits that coverage belongs in the Tower 1 year.  However, Fiserv's arguments for coverage in one year or the other were made in the alternative.  Fiserv contends that the First American action was filed on April 1, 2010, during the Tower 2 policy period, thereby triggering the coverage obligations of the Tower 2 insurers.  Alternatively, Fiserv maintains that if coverage is precluded under the Tower 2 policies, the First American action constitutes a potential claim noticed to the Tower 1 insurers.  The court reads no admissions into these alternative arguments, even if Fiserv, when arguing for coverage under one tower, had to assume weaknesses in or failure of its case against the other tower.  *Cf. McCaskill v. SCI Mgmt. Corp.*, 298 F.3d 677, 681 (7th Cir. 2002) (Rovner, J., concurring) (discussing how the

15

doctrine of judicial admissions applies to admissions of fact but not to the parties' legal opinions).

Similarly, the court rejects the insurers' suggestions that statements and arguments in letters by Fiserv counsel to one tower or the other in an attempt to persuade them to cover the settlement constitute facts to be considered by this court. (*See, e.g.*, Doc. 154, ¶ 31.) For instance, legal arguments Fiserv counsel made to the Tower 1 insurers in March or April 2010 contending that claims by BOA or First American related back to prior claims or the potential claims noticed in June 2009 will not be considered evidence that the First American action actually relates back. Fiserv was arguing for coverage by Tower 1, not conceding that coverage did not exist under Tower 2. Fiserv should not be penalized for attempting to get coverage under one or both towers; it was prudently seeking coverage wherever it could.

Third, the court does not find the settlement by ACE Westchester to constitute a fact favoring coverage in the Tower 2 year. ACE Westchester could have settled for any number of reasons. Its settlement does not constitute an admission of coverage to be used against the other Tower 2 insurers. Nor does the court find any acceptance of defense by ACE Westchester under a reservation of rights to constitute a fact in favor of coverage in the Tower 2 year or that somehow binds Endurance or XL.

Fourth, the court is not persuaded that coverage *must* be found against either the Tower 1 or the Tower 2 insurers. Though there may be a presumption of continuous coverage for claims between two tower years, if Fiserv did not comply with its notice or requirements, for instance, Fiserv could lose against both towers.

16

A.     Tower 1 Coverage

It is undisputed that First American filed its third-party case against Fiserv during the Tower 2 policy period.  Because the only way for coverage to fall under Tower 1 would be if the potential-claims notice captured the First American action, the court will start with the issue of Tower 1 coverage.  The predominant issue in this case is whether the First American claim was included in the potential-claims notice sent to the Tower 1 insurers. If so, coverage could fall back to that tower and be excluded from Tower 2 coverage.  But if not, the Tower 1 insurers are out of this case.

The Hiscox policy provided coverage when Fiserv's performance of or failure to perform business activities "result[ed] in a claim first made against [the insured] during the policy period."  (Doc. 135, ¶ 3; Doc. 161, ¶ 3.)  "Claim" was defined in the Hiscox policy as "any written assertion of liability or any written demand for financial compensation or injunctive relief made against you anywhere in the world."  (Doc. 122, Ex. 6 at FISERV-001287912 (emphasis deleted).)

The Hiscox policy contained these notice provisions:

A.  Claims

You must notify us of claims against you as soon as practicable and within the policy period.  Proper notification of claims must be sent in accordance with the notification details set forth on the Declarations.

B.  Potential Claims

You may notify us of potential claims under this policy.  If you do, such notification must be provided as soon as practicable and within the policy period, and must to the full extent possible identify the particulars of the potential claim, including identifying the potential claimant(s), the likely basis for liability, the likely demand for relief, and any additional information about the potential claim that we reasonably request.  If such a potential claim notification is made to us then we will treat any claim arising from the same

17

particulars as that notification as if it had first been made against you on the date you properly notified us of it as a potential claim, even if that claim is first made against you after the policy period has expired. Proper notification of potential claims must be sent in accordance with the notification details set forth on the Declarations.

(Doc. 135, ¶ 4 (emphasis deleted); Doc. 122, Ex. 6 at FISERV-001287891; Doc. 146, ¶ 34; Doc. 152, ¶ 13.) "Potential claim" was defined as "any matter reasonably likely to lead to a claim covered under this policy." (Doc. 135, ¶ 5; Doc. 141, ¶ 5; Doc. 122, Ex. 6 at FISERV-001287913 (emphasis deleted).)

Regarding the required retention, the Hiscox policy provided that if a series of claims arose from "the same original cause, a single source or a repeated or continuing problem in your work," then all notifications that Hiscox accepted as related would "be treated as a single claim and you need only pay a single retention," and "[a]ll of the notifications that are related will be considered as having been made on the date of your first proper notification to us." (Doc. 162, ¶ 29; Doc. 179, ¶ 29; check Doc 122, Ex. 6 at FISERV-001287911.)

The Hiscox policy contained a choice of law provision indicating that the policy and its construction were governed by New York law without regard to that state's choice of law principles. (Doc. 135, ¶ 7; Doc. 146, ¶ 35.)

The National Union and Continental policies generally "followed form" to the Hiscox policy.[3] (Doc. 135, ¶ 8; Doc. 146, ¶ 30; Doc. 160, ¶ 30; Doc. 122, Ex. 6 at FISERV-1287857; Doc. 157 at 35, ¶ 7; Doc. 175, ¶ 7.)

---

[3]"Following form is an insurance industry term of art that is typically understood by insurance professionals to suggest that an excess or umbrella policy incorporates the terms of another underlying policy." *Wadzinski v. Auto-Owners Ins. Co.*, 2012 WL 75, ¶ 29, 342 Wis. 2d 311, ¶ 29, 818 N.W.2d 819, ¶ 29 (2012). The practice is used so that primary and excess levels of insurance maintain the same terms of coverage. *Id.*

18

The National Union policy stated that it provided Fiserv with coverage in accordance with the same terms, conditions, exclusions, and limitations as stated in the Hiscox policy subject to

> (a) the warranties, terms, conditions, exclusions and limitations of this policy, including any endorsement attached hereto, and
>
> (b) the provisions that, notwithstanding any other provision of this policy, in no event shall this policy provide coverage broader than that provided by the Followed Policy, unless such broader coverage is specifically agreed to by the Insurer and identified as broader coverage in a written endorsement attached hereto.

(Doc. 135, ¶ 8; Doc. 122, Ex. 8 at FISERV-001287836, FISERV-001287840.[4]) The National Union policy provided that notice of a claim had to be given in the same manner and to the extent as stated in the Hiscox policy but added that if

> to the extent permitted by the terms and conditions of the Followed Policy, written notice of circumstances that might reasonably be expected to give rise to a Claim has been given to the Insurer, then any Claim that is subsequently made against the Insured and reported to the Insurer alleging, arising out of, based upon or attributable to the facts alleged in the Claim or circumstances of which such notice has been given, or alleging any Wrongful Act which is the same as or related to any Wrongful Act alleged in the Claim or circumstances of which such notice has been given, shall be considered made at the time such Claim or circumstances has been given to the Insurer.

(Doc. 135, ¶ 10; Doc. 122, Ex. 8 at FISERV-001287842.) "Claim" was defined as having the same meaning as in the Hiscox policy. (Doc. 135, ¶ 10.)

The Continental policy stated that coverage under that policy

> shall then apply in conformance with the provisions of the Primary Policy, or any more restrictive provisions of the Underlying Excess Policies, except for the premium, Limit of Liability, and any other provision specifically set forth

---

[4]Endurance and XL submit a proposed fact that National Union's policy "does not strictly follow form to the Hiscox policy" (Doc. 152, ¶ Add'l 1), but for purposes of this case the policy generally follows form except as to the notice provision.

19

in this Policy.  In no event shall this Policy provide broader coverage than is provided by the most restrictive terms of any Underlying Insurance.

(Doc. 146, ¶ 29; Doc. 122, Ex. 9 at FISERV-001287857.)

In a letter dated June 25, 2009, Fiserv notified the Tower 1 insurers of four claims made in letters Fiserv received from TD Banknorth, Sovereign, Wachovia, and TCF Bank. (Doc. 123, Ex. 22 (the "actual-claims notice").)  The TD Banknorth claim concerned use of QuickClose, the Sovereign and Wachovia claims concerned use of QSS, and the TCF Bank claim concerned use of ValueGuard.  (Doc. 152, ¶ 4; Doc. 173, ¶ 4; Doc. 123, Ex. 22 at FISERV-001214012.)  TD Banknorth's claim related to a particular home-equity line of credit loan for which Ticor, the title insurer, denied an insurance claim because the pertinent title defect was not submitted in a timely manner; TD Banknorth claimed that Fiserv had failed to timely correct the title defect as required.  Allegedly, Fiserv had not timely obtained a life tenant's signature, and another mortgage was then recorded ahead of TD Banknorth's.  TD Banknorth claimed that Fiserv breached its contractual obligation to obtain and record the mortgage documentation and, held itself out to be Ticor's agent for purposes of notice with timely notice of the title defect in 2004, yet failed to notify Ticor until 2007.  (Doc. 123, Ex. 22 at FISERV-001214014 to FISERV-001214018.)

According to the actual-claims notice, Sovereign claimed that Fiserv had improperly denied reimbursement on four claims under QSS that involved chain-of-title or ownership issues and that Fiserv was improperly delaying payment on twenty additional claims.  (Doc. 123, Ex. 22 at FISERV-001214019 to FISERV-001214020.)  The Wachovia letter discussed a dispute over one QSS claim denial by Fiserv related to a prior lien left on a property by a prior owner.  Wachovia believed that the title issue was covered by the terms

20

of the QSS agreement and Fiserv's failure to file Wachovia's security instrument in a first-lien position.  (Doc. 123, Ex. 22 at FISERV-001214023.)  The TCF Bank claim involved ValueGuard.  (Doc. 123, Ex. 22 at FISERV-001214012.)

In a second letter dated June 25, 2009, Fiserv notified the Tower 1 insurers of potential claims.  (Doc. 123, Ex. 21 (the "potential-claims notice").  The potential-claims notice recapped the claims of TD Banknorth, Sovereign, Wachovia, and TCF Bank as well as a prior-noticed lawsuit filed against Fiserv by Navy Federal Credit Union regarding use of ValueGuard.  (*Id.* at FISERV-001213977 to FISERV-001213979.)  Fiserv wrote that these banks "complain that they have suffered losses arising out of Fiserv's alleged negligent provision of QuickClose and QSS services including failing to identify defects in title and/or filing a security instrument in the correct lien position." (*Id.* at FISERV-001213979.)  The letter then continued:

> The Potential Claims for which Fiserv provides notice here arise from both ValueGuard and QuickClose, and also their replacements, VSS and QSS.  A number of Fiserv's lender customers other than NFCU, TD Banknorth, Sovereign, Wachovia and TCF Bank, including but not limited to, SunTrust Bank, Compass Bank, Regions Bank, Altier Credit Union, Comerica, ORNL, and Bank of America, each of whom are using one or more of Fiserv's ValueGuard, VSS, QuickClose and QSS services have informed or many inform Fiserv that they:  1) have suffered losses arising out of their use of or Fiserv's allegedly negligent provision of such services; 2) believe "insurance" claims submitted by them to Fiserv are valid and payable but were denied or not timely paid; and 3) believe Fiserv made misrepresentations in connection with the provisions of these services.  Currently, over 4,600 "insurance" claims submitted by lender clients are pending (with, consistent with the downturn in the economy, more expected) and almost another 2,000 have been denied, though Fiserv is hopeful that only a small percentage of such "insurance" claims will result in "claims" defined in the Hiscox Policy.
>
>     . . . . Given the lawsuit filed by NFCU, the Sovereign, TD Banknorth and TCF Bank Claims, and communications from other lenders with respect to alleged losses they incurred using Fiserv services, it is "reasonably likely"

21

that additional Fiserv lender customers (including those identified above) will make similar or related "claims" against Fiserv arising out of the ValueGuard, VSS, QuickClose and/or QSS services Fiserv provides or has provided. . . .

. . . . Of course, Fiserv is unable to predict with absolute certainty the nature of future actual "claims." Nonetheless, to the extent any materialize, such "claims" likely will include allegations that Fiserv negligently provided ValueGuard, VSS, QuickClose and/or QSS services (i.e., appraisal and lien protection services) and, as a result, that Fiserv's lender clients suffered losses for which they believe Fiserv is liable.

Accordingly, potential claimants are all Fiserv lender customers who have or are using Fiserv's ValueGuard, VSS, QuickClose and/or QSS services. (A list of such lenders is attached hereto[.)] The bases for alleged liability (and causes of action) likely will include, but not necessarily be limited to, those asserted by NFCU in its complaint and by TD Banknorth, Sovereign, Wachovia and TCF Bank in their Claims. Thus, such claims, if asserted, can be expected to include alleged acts and omissions by Fiserv in the provision or description of ValueGuard, QuickClose, VSS and/or QSS services that constitute, the lenders would say, negligence, breach of duty, and breach of ValueGuard, QuickClose, VSS and/or QSS services agreements. In other words, lenders may assert that Fiserv committed some error, omission or misrepresentation related to the appraisal and lien protection and associated services it offers. Lenders may also assert, in connection with Fiserv's associated "insurance" services, that Fiserv failed to adequately obtain insurance to pay, or to pay itself, their alleged apprisal and lien protection related losses. The likely demands for relief may include alleged actual damages, attorneys' fees and costs and possibly punitive damages.

(Doc. 123, Ex. 21 at FISERV-001213979 to FISERV-001213980.)   A twelve-page list of potential claimants—lenders who participated in Fiserv's programs—was attached to the letter. (Doc. 123, Ex. 21 at FISERV-001213982 to FISERV-001213993; Doc. 146 ¶ 43.) The potential-claims notice did not mention First American or any other title insurers as potential claimants. (Doc. 135, ¶ 14; Doc. 152, ¶ 14; Doc. 161, ¶ 14.) The potential-claims notice indicated that it was copied to all carriers in Tower 1. (Doc. 152, ¶ 18.)

With a letter of June 26, 2009, Fiserv provided Hiscox with notice of a lawsuit filed by Ticor Title Insurance Company alleging that Fiserv failed to conduct a title search

22

properly as required by an agency agreement in regard to a home-equity line of credit issued by Fleet Bank for certain property in New York. (Doc. 123 Ex. 1 at FISERV-001214027 to FISERV-001214033; *see* Doc. 162, ¶ 3.) Ticor and Fiserv stipulated to discontinuance with prejudice. (Doc. 162, ¶ 4; Doc. 170, ¶ 4; Doc. 163, Ex. A.)

On October 22, 2009, Hiscox responded regarding Fiserv's letters about claims and potential claims. (Doc. 122, ¶ 21.) As for the potential claims, Hiscox wrote:

> Your June 25, 2009 letter also purports in section 2 to provide a notice of potential claims . . . . Hiscox acknowledges this notice with thanks. If any of the "potential claimants" you identify in the attachment to your letter actually asserts a claim against Fiserv (i.e., makes a written assertion of liability or makes a written demand for compensation or injunctive relief), we ask that you please notify us immediately. In the interim, you will understand that it is necessary for Hiscox to reserve all rights with respect to any such potential, future claims, including with respect to whether we were given proper notice of the potential claims or the circumstances that might give rise to them.

(Doc. 123, Ex. 23 at 6; Doc. 135, ¶ 23.)

In the BOA action filed on March 5, 2010, BOA alleged that First American improperly failed to pay on numerous LPI-policy claims, which BOA categorized as either lien-position claims (due to an undisclosed senior lien that lowered BOA's priority from what it believed it was receiving), vesting claims (due to the pertinent documents lacking a necessary signature), or legal description claims (due to errors in the legal description Fiserv attached to a mortgage or deed of trust before recording). BOA maintained that as the housing crisis grew and borrowers began to default on their home-equity lines of credit, BOA had a corresponding increase in the number of claims it made under the LPI policies issued by First American, but as the volume of claims increased, First American made significant changes to its claims-handling practices and stopped paying covered claims in

23

violation of the LPI policies.  (Doc. 146, ¶¶ 14, 15.)  BOA alleged that First American breached the terms of the LPI policies issued under QuickClose by denying over 2200 purportedly covered claims and acting in bad faith by failing to timely respond to at least 2300 submitted claims.  (Doc. 146, ¶¶ 12, 13.)  According to BOA, First American, among other things, failed to timely pay or communicate coverage decisions; rested coverage decisions on a valuation-based method for calculating loss amounts instead of the charge-off amount or unpaid principal balance; imposed a foreclosure requirement inconsistent with the terms of the LPI policies; denied claims on account of an exclusion relating to purchase-money mortgages when BOA's loan was not a purchase-money mortgage; requested additional information and documents that were not required; denied claims after First American had waived its opportunity to request additional information; denied claims based on conditions not contained in the LPI policies; denied claims based on timing requirements without establishing prejudice; denied lien-position claims based on liens that appeared to be unsecured; and denied lien-position and vesting claims based on a knowledge exclusion when BOA's loan officers did not have actual knowledge of the intervening liens.  (Doc. 122, Ex. 1 at FISERV-000000163 to FISERV-000000168.)  In addition, BOA charged that First American breached its duty of good faith and fair dealing in various ways; committed unfair claims-settlement practices under North Carolina law; and, through its agent Fiserv, made certain statements that constituted misrepresentations and false advertising of the LPI policies under North Carolina law.  (Doc. 122, Ex. 1 at FISERV-000000169 to FISERV-000000175.)

In its third-party action against Fiserv, First American alleged that Fiserv was authorized to issue First American LPI policies relating to home-equity loans only under the

24

National Agency Agreement, which provided that Fiserv was not to issue any First American policy unless Fiserv had determined insurability of the title in accord with First American's instructions and standards and that Fiserv was not to assume any extraordinary risk or undertaking on First American's behalf without First American's express consent. According to First American, Fiserv's authority extended only to issuance of policies and collection of premiums and did not authorize Fiserv to act as an agent for First American regarding receipt of notices of loss or proofs of claim, though it did require Fiserv to forward any such notice or proof it received to First American immediately. Further, the National Agency Agreement allegedly provided that Fiserv was to indemnify First American for loss arising from Fiserv's failure to comply with the agreement's terms or any rules or instructions given to Fiserv by First American. (Doc. 122, Ex. 1 at FISERV-000000284.)

According to the third-party complaint, lenders had been seeking to increase their shares of the home-equity mortgage business and BOA closed many home-equity loans without following contractual and required underwriting standards. First American alleged that in the SOW BOA authorized Fiserv to submit LPI-policy claims on its behalf to First American, and that as BOA's losses on its home-equity-line portfolio increased it had Fiserv submit hundreds of LPI-policy claims without first determining whether a policy should have issued in the first place, whether there was a covered loss, or whether the amount of loss under the policy was calculated correctly. (*Id.* at FISERV-000000283.) First American alleged that the SOW set forth the requirements that BOA had to fulfill to obtain an enforceable LPI policy or obtain payment for loss under an LPI policy and that First American permitted Fiserv to act as its agent in issuing LPI policy certifications based on the expectation that BOA and Fiserv would comply with the SOW provisions. (*Id.* at

25

FISERV-000000285 to FISERV-000000287.) First American charged that the SOW imposed obligations on BOA and Fiserv regarding BOA's claims under the LPI policies: BOA had to timely identify claims and provide certain documentation and certifications, Fiserv was to establish a process and forms for claims submission, and then submit claims to First American. First American alleged that it was a third-party beneficiary of the SOW. (*Id.* at FISERV-000000287 to FISERV-000000288.)

Further, First American maintained that the National Agency Agreement required Fiserv to, among other things, (1) comply with issuing guidelines promulgated by First American, (2) immediately forward all claims to First American, and (3) provide reasonable assistance in the defense of any claim. (Doc. 146, ¶ 20.) First American alleged that the National Agency Agreement provided that Fiserv was liable for and had to indemnify First American against any loss "sustained or incurred by First American, arising from [Fiserv's] failure to comply with the terms of the Agency Agreement, with the rules, regulations or instructions given to [Fiserv] by First American, or by [Fiserv's] negligence or misconduct." (Doc. 122, Ex. 2 at FISERV-000000290.)

As its first cause of action against Fiserv, First American alleged breach of contract and contractual indemnity. First American pointed to Fiserv's duties under the National Agency Agreement to comply with the instructions and requirements of First American, to participate in transaction closings in which First American policies were issued in accord with prudent practice and First American requirements, to not issue any policy unless Fiserv had determined the insurability of title in accord with First American standards, to immediately forward any claims or demands regarding First-American policies, and to assist in the defense of any claim, then claimed that if First American was held liable to

26

BOA then to the extent such liability was the result of Fiserv's breach of the agency agreement or failure to perform pursuant to the SOW, Fiserv was liable to First American. (*Id.* at FISERV-000000289 to FISERV-000000291.)  First American's second cause of action alleged equitable indemnity by Fiserv for any torts of misrepresentation and false advertising, unfair practices, or breach of the duty of good faith:

> If First American is held liable to BOA on any or all of BOA's Tort Claims First American's liability will result from technical fault imposed by law resulting from the acts and omissions of Fiserv and the Roes and such liability would result from First American's passive negligence and by the active negligence or other wrongdoing of Fiserv and the Roes causing injury to BOA for which First American is derivatively liable.

(Doc. 141, ¶¶ 41, 42; Doc. 154, ¶¶ 41, 42; Doc. 122, Ex. 2 at 000000291.)

The third cause of action alleged equitable contribution or joint-and-several liability. (*Id.* at FISERV-000000291 to FISERV-000000292.)  The fifth cause of action[5] sought a declaration that First American was entitled to indemnification by Fiserv under the terms of the agency agreement for First American's losses arising from Fiserv's failure to comply with the National Agency Agreement, including failure to participate in loan closings to insure BOA was adhering to required underwriting practices, to timely and adequately submit BOA's claims, and to adequately participate in First American's defense.  (*Id.* at FISERV-000000292 to FISERV-000000294.)

Under New York law, interpretation of the policy is a question of law for the court, and the court gives the policy's unambiguous terms their plain and ordinary meaning. *Essex Ins. Co. v. Laruccia Constr., Inc.*, 71 A.D.3d 818, 819 (N.Y. App. Div. 2010).  The insured bears the burden of demonstrating that a claim falls within the scope of a policy's

---

[5]First American's fourth cause of action was aimed at BOA.

coverage and that the insured provided required notice. *Thomson v. Power Auth.*, 217 A.D.2d 495, 496 (N.Y. App. Div. 1995). Compliance with the notice provisions of a claims-made policy is a condition precedent to an insurer's liability—such notice is essential to obtain coverage for a claim. *Id.*

Based on the undisputed evidence in this case, the court finds that the potential-claims notice did *not* include the First American action claims within its scope. The Hiscox policy's notice provision required that as to potential claims Fiserv had "to the full extent possible identify the particulars of the potential claim, including identifying the potential claimant(s), the likely basis for liability, the likely demand for relief, and any additional information about the potential claim that [Hiscox] reasonably request[ed]." (Doc. 122, Ex. 6 at FISERV-001287891.) The potential-claims notice notified the Tower 1 insurers of claims only by lenders as the potential claimants, relating to only the lenders' side of QuickClose with Fiserv's services for lender clients the likely source of the potential claims. The potential-claims notice referenced lenders nine times and did not reference problems between Fiserv and title insurers at all. The twelve-page list attached to the potential-claims notice did not include title insurers. The potential-claims notice remarks on Fiserv's "lender customers" who (1) could claim that Fiserv negligently provided QuickClose services (thus referencing the lenders' side of the program); (2) believed that insurance claims submitted by them to Fiserv were valid and payable but were denied or not timely paid (thus describing claims of only the lenders who sought payment on policies, not the title insurers who were denying payment); and (3) believed Fiserv made misrepresentations to them (i.e., the lender customers) in connection with those same QuickClose services. (Doc. 123, Ex. 21 at FISERV-001213979.) The letter described the issue of pending

28

insurance claims submitted by "lender clients," not the concerns of a title insurer who believed Fiserv improperly issued policy certificates or should have assisted the title insurer's defense. The potential-claims notice referenced the lawsuit filed by NFCU and the claims made by TD Banknorth, Sovereign, and TCF and said that other "lender customers" reasonably likely would make similar or related claims against Fiserv—not that title insurers would make claims relating to Fiserv's title-agent services to them. Further, the notice indicated that lenders may assert that Fiserv failed to adequately obtain insurance to pay lien protection-related losses—a claim that lenders, not title insurers, would make. Based on the notice of actual claims and the potential-claims notice, Fiserv was focused on and provided notice of only potential liability to lenders arising from the lenders' side of QuickClose.

Although First American's claims and the potential claims set forth in the potential-claims notice all involve Fiserv's activities in QuickClose, the claims differ substantially. The lenders' potential claims arise from Fiserv's actions under agreements such as the SOW between Fiserv and BOA. Although First American alleges that it was a third-party beneficiary of the SOW, the duties First American contends Fiserv breached predominantly stemmed from the National Agency Agreement.

Certain parties highlight the phrase requiring identification of potential-claim particulars "to the full extent possible." But that phrase, allowing some flexibility in the notice requirements, does not permit encompassing claims of an entire separate set of Fiserv customers to which Fiserv owed substantially different duties under a separate agreement. That phrase perhaps could capture claims of a lender customer not listed on the attachment, but not a whole separate category of potential claims and claimants.

29

Nevertheless, even though the potential claims of title insurers related to Fiserv's actions as their agent were not included in the potential-claims notice, the Hiscox policy said that Hiscox would "treat any claim arising from the same particulars as that notification as if it had first been made" at the same time. (Doc. 135, ¶ 4 (emphasis deleted); Doc. 122, Ex. 6 at FISERV-001287891.) The court finds that under any reasonable interpretation of the policy language, the third-party claims by First American do not constitute "the same particulars" as the potential claims of lenders that were set forth in the potential-claims notice. That Fiserv's allegedly liable conduct occurred in relation to QuickClose is not sufficient to make the claims have "the same particulars." The QuickClose program appears to have involved multiple lenders and thousands of transactions and LPI policies. And Fiserv played multiple roles in the program—performing closing duties such as adding legal descriptions and obtaining necessary signatures, acting as title agent for issuing LPI policies, creating forms and processes for lenders to file claims on the LPI policies, and processing those policy claims for the lenders. The First American lawsuit, on the whole, alleged different particulars of Fiserv's activity and potential liability than the lenders' potential claims.

The additional notice language in the National Union policy does not alter the outcome for that insurer. Again, the National Union policy provided that if "notice of circumstances that might reasonably be expected to give rise to a Claim" was given to National Union as permitted in the Hiscox policy, any subsequent claim "arising out of, based upon or attributable to the facts alleged in the Claim or circumstances of which such notice has been given, or alleging any Wrongful Act which is the same as or related to any Wrongful Act alleged in the Claim or circumstances of which such notice has been given,"

30

would be considered to have been made at the same time. (Doc. 135, ¶ 10; Doc. 122, Ex. 8 at FISERV-001287842.) An interpretation of the actions asserted in the First American complaint as the same or related wrongful acts as those in the potential-claims notice would result in National Union's liability exceeding that of Hiscox, violating the provision of the National Union policy that "notwithstanding any other provision of this policy, in no event shall this policy provide coverage broader than that provided by the Followed Policy, unless such broader coverage is specifically agreed to by the Insurer and identified as broader coverage in a written endorsement attached hereto." (Doc. 135, ¶ 8; Doc. 122, Ex. 8 at FISERV-001287840.) No party has pointed to any written endorsement that provides such broader coverage.

Therefore, National Union and Continental Casualty are entitled to summary judgment and dismissal of the claims against them.

B.    Tower 2 Coverage[6]

The insuring agreement for the ACE Westchester policy provides for payment of damages and claims expenses by reason of a "Claim" first made against the insured and reported to the insurer during the policy period for any "Wrongful Act" taking place after June 1, 1992. (Doc. 141, ¶ 3; Doc. 154, ¶ 3; Doc. 122, Ex. 16 at FISERV-001349834.) "Claim" is defined as "a written demand against any Insured for monetary or non-monetary damages" as well as "a civil proceeding against any Insured for monetary damages, non-monetary damages or injunctive relief, commenced by the service of a complaint or similar

---

[6]The Tower 1 insurers responded to the Tower 2 insurers' proposed statements of material fact. (*See* Doc. 166.) However, because the Tower 1 insurers are now out of this dispute, the court need not considered those responses. The remaining dispute is between Fiserv and the Tower 2 insurers. Therefore, the court has considered only Fiserv's responses.

31

pleading." (Doc. 122, Ex. 16 at FISERV-001349835; *see* Doc. 141, ¶ 4 (emphasis deleted).) "Wrongful Act" means "any actual or alleged negligent act, error, omission, misstatement, [or] misleading statement . . . committed by the Insured or by any other person or entity for whom the Insured is legally liable in the performance of or failure to perform Professional Services." (Doc. 141, ¶ 5; Doc. 122, Ex. 16 at FISERV-001349837 (emphasis deleted).) "Professional Services" means services

> [s]olely in the performance of providing Real Estate Loan Servicing to Financial Institutions: Real Estate Appraisals; . . . Title Searches; Title Agent; Title Insurance; QuickClose Title or similar products; Loan Processing; Mortgage Processing; Closing/Escrow Services; Default Mitigation Services; and related consulting services for others for a fee or other consideration.

(Doc. 141, ¶ 6; Doc. 122, Ex. 16 at FISERV-001349832, FISERV-001349836.)

The ACE Westchester policy contains various exclusions (Doc. 122, Ex. 16 at FISERV-001349837 to FISERV-001349838), four of which are discussed in more detail below. The ACE Westchester policy does not set forth any particular law that applies.

The Endurance and XL policies "followed form" to the ACE Westchester policy. (Doc. 141, ¶ 1[7]; *see* Doc. 154 at 26, ¶ 1 ("This Policy incorporates by reference the insuring clauses, warranties, definitions, terms, conditions, exclusions and other provisions contained in the Primary Policy . . . except as otherwise provided herein." (emphasis deleted)), ¶ 2 ("Coverage hereunder will apply in conformance with the terms, conditions, endorsements and warranties of the Primary Policy together with the terms, conditions, endorsements and warranties of any other Underlying Insurance." (emphasis deleted));

---

[7]Because the Tower 1 insurers are now out of the case, in this section the court has not considered their objections to to this and other statements of proposed facts. Endurance and XL admit that their policies followed form to the ACE Westchester policy. (Doc. 154, ¶ 1.)

32

Doc. 176, ¶¶ 1, 2; Doc. 137, Ex. 1 at 5 n.6.)  The XL policy stated that "in no event will the coverage under this Policy be broader than the coverage under any Underlying Insurance."  (Doc. 154 at 26, ¶ 2 (emphasis deleted); Doc. 175, ¶¶ 1, 2.)

The First American action was filed eight months into the Tower 2 insurance program.  (Doc. 141, ¶ 19.)

As part of the underwriting process for the Tower 2 insurance program, Fiserv provided a "bordereau[8]"  and updated bordereaux (one on June 30, 2009) to the Tower 2 insurers that listed each individual claim or potential claim regarding which Fiserv provided notice to the Tower 1 insurers.  (Doc. 141, ¶ 59; Doc. 154, ¶ 79, Doc. 127, Ex. 50 at 219-21.)  The bordereaux stated that "[p]otential claims that may arise from both ValueGuard and QuickClose and also their replacements, VSS and QSS" had been noticed to the Tower 1 insurers.  (Doc. 154 at 44, ¶¶ 78, 79; Doc. 176, ¶¶ 78, 79; Doc. 122, Ex. 14 at WESTROPE 000401.)  Sue Pavlik of Fiserv was aware of these bordereaux.  (Doc. 154 at 44, ¶ 80.)   During the underwriting process, the Tower 2 insurers were provided information about Fiserv's services, including QuickClose.  (Doc. 141, ¶ 60.)

At deposition, XL's senior vice-president of underwriting acknowledged a general expectation that there would be coverage for QuickClose claims under the XL policy so long as they were not related to claims previously noticed under a prior year.  (Doc. 141, ¶ 7; Doc. 154, ¶ 7; Doc. 129, Ex. 56, at 90-92.)

Because the policies do not set forth that any particular state's law applies, the court applies the law of the forum.  *Coleman v. Ramada Hotel Operating Co.*, 933 F.2d 470, 473

---

[8]A bordereau appears to be a report about reinsured risks.  Black's Law Dictionary 220 (10th ed. 2014).  (*See, e.g.*, Doc. 122, Ex. 14.)

(7th Cir. 1991). Under Wisconsin law, the construction of a contract is a question of law, and the court seeks to determine and give effect to the intent of the contracting parties. *Am. Med. Sec., Inc. v. Exec. Risk Specialty Ins. Co.*, 393 F. Supp. 2d 693, 699 (E.D. Wis. 2005) (Griesbach, J.); *Am. Family Mut. Ins. Co. v. Am. Girl, Inc.*, 2004 WI 2, ¶ 23, 268 Wis. 2d 16, ¶ 23, 673 N.W.2d 65, ¶ 23; *Wis. Label Corp. v. Northbrook Prop. & Cas. Ins. Co.*, 2000 WI 26, ¶ 23, 233 Wis. 2d 314, ¶ 23, 607 N.W.2d 276, ¶ 23. Insurance policies are construed as they would be understood by a reasonable person in the position of the insured. *Am. Med. Sec., Inc.*, 393 F.3d at 699; *Am. Family Mut. Ins. Co*, 2004 WI 2, ¶ 23; *Wis. Label Corp.*, 2000 WI 26, ¶ 25. Nevertheless, an insurance policy should not be construed to cover risks that the insurer did not underwrite and for which it did not receive a premium. *Am. Med. Sec., Inc.*, 393 F.3d at 699-700; *Am. Family Mut. Ins. Co.*, 2004 WI 2, ¶ 23; *Wis. Label*, 2000 WI 26, ¶ 25.

The court first examines whether the policy's insuring agreement initially grants coverage. Next, if the claim triggers the initial grant of coverage, the court examines exclusions to see whether any of them preclude coverage. Exclusions are narrowly construed against the insurer if ambiguous. If an exclusion has an exception, the court then analyzes whether the exception reinstates coverage. *Am. Family Mut. Ins. Co.*, 2004 WI 2, ¶ 24, *quoted in Am. Med. Sec., Inc.*, 393 F. Supp. 2d at 700.

> Words and phrases in an insurance policy are ambiguous when they are so imprecise and elastic as to lack any certain interpretation or are susceptible to more than one reasonable construction. Terms of an insurance policy may be inherently ambiguous or may be ambiguous when considered in the context of the insurance policy as a whole.

*Frost v. Whitbeck*, 2002 WI 129, ¶ 18, 257 Wis. 2d 80, ¶ 18, 654 N.W.2d 225, ¶ 18. Whether ambiguity exists is a legal question. *Id.*

34

Here, the ACE Westchester policy provides a broad initial grant of coverage: payment of all damages and claims expenses due to a claim made against the insurer and reported to the insurer during the policy period. (*See* Doc. 122, Ex. 16 at FISERV-001349834.) The Tower 2 insurers concede as much. (*See* Doc. 137, Ex. 1 at 12.) The First American action was filed during the Tower 2 policy period, and the Tower 2 insurers have not argued that it was not timely reported to them. Therefore, the First American action triggers an initial grant of coverage, and the court turns to the exclusions.

1.      Prior notice exclusion and single claim provision

Exclusion L in the ACE Westchester policy (the "prior notice exclusion") provides that the insurer is not liable for damages or claims expenses on account of any claim

alleging, based upon, arising out of, or attributable to:

1.      any Wrongful Act, fact, circumstance or situation which has been the subject of any written notice given under any other policy of which this Policy is a renewal or replacement or which it succeeds in time; or

2.      any other Wrongful Act whenever occurring which, together with a Wrongful Act which has been the subject of such notice would constitute Interrelated Wrongful Acts.

(Doc. 122, Ex. 16 at FISERV-001349838.) "Interrelated Wrongful Acts" means "all Wrongful Acts that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of related facts, circumstances, situations, events, transactions or causes." (Doc. 122, Ex. 16 at FISERV-001349836 (emphasis deleted).)

The Tower 2 insurers contend, under clause 1 of exclusion L, that the First American action was captured by the potential-claims notice given to the Tower 1 insurers and therefore is excluded under the first subpart of the prior notice exclusion. However, as discussed above, the court concludes as a matter of law that the language of the

35

potential-claims notice did not capture the claims First American made in its third-party complaint. Fiserv is entitled to summary judgment on this point.

Further, the First American third party complaint was not "alleging, based upon, arising out of, or attributable to" the same Wrongful Act as any of the four claims in the actual-claims notice. The TCF Bank claim involved Fiserv's ValueGuard services. The Sovereign and Wachovia claims involved Fiserv's QSS services, which the evidence, even taken in the Tower 2 insurers' favor, indicates was a different program when it came to insurance with which First American was not involved. And though the TD Banknorth claim involved QuickClose, it pertained to one instance of Fiserv's failure to obtain a needed signature and one instance of Fiserv's failure to forward an LPI-policy claim to *Ticor* (not First American). Thus, it was a distinct Wrongful Act from First American's allegations of widespread deficiencies on Fiserv's part. The actual-claims notice described claims by banks for the lenders' side of Fiserv's services, not the title insurers' side of any such services.

Next, the Tower 2 insurers contend, under clause 2 of exclusion L, that the alleged actions of Fiserv in the First American third-party complaint constitute Interrelated Wrongful Acts with those set forth in the potential-claims notice or those in the actual-claim notice (relating to TD Banknorth, Sovereign, Wachovia, and TCF Bank). The Tower 2 insurers maintain that the title-insurer-side claims have a common nexus with and are related to the lender-side claims: all of Fiserv's alleged actions or omissions occurred as part of QuickClose and stemmed from Fiserv's alleged failure to perform its duties under that program and the program's agreements.

36

These assertions stretch the exclusion too far.  If "*any* fact, circumstance, situation, event, transaction, cause or series of" related items is interpreted as broadly as the Tower 2 insurers contend, then coverage under the Tower 2 policies for the professional services provided as part of "QuickClose Title or similar products" would be illusory.  By the time the Tower 2 policies took effect Fiserv had notified the Tower 1 insurers of various claims and potential claims arising from its QuickClose services, and the Tower 2 insurers knew that from the bordereaux.  If any and all claims arising from QuickClose services were Interrelated Wrongful Acts simply because they arose from QuickClose services, Fiserv was paying for coverage that it could not possibly receive.  Though courts should not interpret insurance policies to provide coverage for risks that the insurer did not contemplate, that is not the case here—the policy's specific reference to coverage for "QuickClose Title or similar products" evidences that the parties expected those services to be covered.

Thus, the Interrelated Wrongful Acts definition is ambiguous, and ambiguities are interpreted against the insurer.  A simplified example confirms the ambiguity.  Would a surgeon commit two Interrelated Wrongful Acts if he or she operated on the wrong leg during one patient's surgery but inadequately washed before a completely separate surgery, causing infection?  The acts would have in common the fact that the doctor operated on patients.  But the acts would not be interrelated in any common-sense understanding.  The doctor was acting in different areas of her or his work, with different patients. The XL underwriter's acknowledgment that QuickClose claims would be covered if not related to previous claims supports the court's reading of the policy language.  Thus, the fact that Fiserv's alleged failures to First American and the lenders occurred as part of

37

the QuickClose program is not enough to make them *all* interrelated, and the exclusion suggesting as much is ambiguous and cannot be read that way.

Another case from this district, addressing an insurance policy under Wisconsin law, supports this conclusion. *See Am. Med. Sec., Inc. v. Exec. Risk Specialty Ins. Co.*, 393 F. Supp. 2d 693 (E.D. Wis. 2005) (Griesbach, J.). In *American Medical*, the insurer sought to avoid coverage for a lawsuit (the "Addison lawsuit") challenging American Medical's "tier rating" practices in underwriting healthcare policies, arguing that the lawsuit was related to a prior administrative proceeding in which the Florida Department of Insurance rejected American Medical's request to charge premiums based on a tier rating. The policy at issue excluded payment of any loss "based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event, Wrongful Act or series of facts, circumstances, situations, transactions, events or Wrongful Acts" that had been alleged in a prior proceeding *Id.* at 700. Judge Griesbach noted that taken literally, the policy language would exclude coverage for any claims if the insured had been involved in any legal proceedings, as "any such proceeding would at least 'involve' the 'fact' that AMS sold insurance. A literal reading of the exclusion would thus render the policy illusory for any insured who had ever been sued and must be rejected under basic principles of insurance policy construction." *Id.* at 703. He found that as a result, the prior proceeding exclusion was ambiguous and had to be construed against the insurer. *Id.* Instead, he found that more identity between the two proceedings was required:

> While the underwriting practices at issue in *Addison* may have been similar to the proposed guidelines at issue in the [administrative] matter, the exclusion requires that the facts, circumstances, situations, transactions,

38

events or Wrongful Acts involved in the claim be the same as those underlying or alleged in the prior proceeding.

*Id.* at 702.

This court recognizes that district judges in California and New York found definitions substantially identical to the Interrelated Wrongful Acts definition in the ACE Westchester policy to be unambiguous and to describe a broad range of relationships between an original claim and other claims. *See XL Specialty Ins. Co. v. Perry*, No. CV 11–02078–RGK (JCGx), 2012 WL 3095331, \*5-\*6 (C.D. Cal. June 27, 2012); *Zunenshine v. Exec. Risk Indem., Inc.*, No. 97 Civ. 5525(MBM), 1998 WL 483475, \*4 (S.D.N.Y. Aug. 17, 1998), *aff'd*, 182 F.2d 902 (2d Cir. 1999). However, those courts were not confronted with facts or argument seeking such an expansive interpretation of "any" as the Tower 2 insurers advance, encompassing a wide variety of the insured's activities. Instead, the *XL Specialty* court assessed whether claims by the FDIC (and others) asserting that IndyMac's officers and directors were negligent in issuing loans that did not meet the bank's underwriting standards were interrelated with a prior class-action lawsuit alleging that IndyMac abandoned its underwriting standards when issuing numerous high-risk loans. That court did not analyze whether *all* of IndyMac's lending practices—for instance, whether it properly processed loan documents—would be related. And the *Zunenshine* court considered whether a lawsuit by corporate investors who had purchased notes from the company against the officers of the company for misrepresenting to them the company's financial condition in three specific ways during a four-month period was related to a prior lawsuit by shareholders charging that the same officers issued false and misleading information to the shareholder group about the company on the same three

39

specific topics over the course of just over a year, including the time period alleged in the noteholders' lawsuit. *See* 1998 WL 483475 at *5. That court did not analyze whether all of the officers' and directors' activities that led the company into bankruptcy were related.

Moreover, to the extent these courts say that Interrelated Wrongful Act definition is unambiguous, this court respectfully disagrees. The policy must be read as a whole, and if one interpretation eliminates virtually all coverage for an activity that is specifically noted as being covered, such a broad interpretation of the word "any" cannot be correct. *See Zunenshine*, 1998 WL 483475 at *5 (stating that "it is axiomatic that a court should not adopt an interpretation of a contract that has 'the effect of rendering at least one clause superfluous or meaningless'").

Nevertheless, even though use of the word "any" may create ambiguity as to how broadly the prior-notice exclusion can be read, the exclusion retains substantial meaning. Judge Griesbach indicated that the wrongful acts had to be the *same*, not just similar or of the same type. The *Zunenshine* court observed that the two Second Circuit district courts in interpreting such a provision had focused on "'whether there was a sufficient factual nexus'" between the two lawsuits or claims. 1998 WL 483475, at *4. This court adopts that focus for resolving the ambiguity. The policy language here contains the words "common nexus." But any random fact does not create the common nexus; instead the two acts must have a common nexus. Thus, the Interrelated Wrongful Acts definition does not include just "any" fact in common between the claims or lawsuits, but instead refers to wrongful acts that are the same or have a substantial common nexus or connection.

Here, QuickClose was a large program that constituted over a third of FLS's business one year, involving thousands of individual transactions. Fiserv's failures to

40

obtain a life tenant's signature in one instance or to timely record a mortgage in another do not share a common nexus with First American's allegations that Fiserv improperly issued LPI certificates when BOA did not meet loan requirements. Here, the First American action was based primarily on alleged breaches of duties Fiserv owed to First American, as title agent under the National Agency Agreement. Again, First American alleged Fiserv's failure to comply with the instructions and requirements of First American, to participate in transaction closings in which First American policies were issued in accord with prudent practice and First American requirements, to not issue any policy unless Fiserv had determined the insurability of title in accord with First American standards, and to assist in the defense of any claim. Issuing LPI certificates without complying with First American's instructions and failing to assist First American in defense of a claim were different actions than attaching legal descriptions and processing home equity mortgages for BOA. Fiserv was a middleman between the lenders and the title insurers, but what it owed to each side differed.

The one area that gives the court pause is that of Fiserv's failure to timely submit BOA claims to First American. BOA and other lenders identified in the potential-claims notice had been complaining about the lack of payment on claims submitted to Fiserv for forwarding to the title insurers. First American in its third-party action accused Fiserv of failing to immediately forward any claims on First-American policies when it received them from BOA. At the heart of these contentions was how long Fiserv held onto BOA's LPI claims before forwarding them to First American. Though the duties to each side of the QuickClose program arose from separate documents and ran to different types of entities, as to this one area it appears that Fiserv engaged in the same or a series of related actions

41

when forwarding (or failing to forward) BOA's LPI-policy claims to First American. As Judge Griesbach observed in *American Medical*, the "exclusion may bar coverage where the second proceeding alleges different consequences of the wrongful acts involved in the first proceeding." 393 F. Supp. 2d at 703; *see Zunenshine*, 1998 WL 483475 at *5 (stating that the prior-litigation exclusion did not require precisely the same parties or legal theories).

Fiserv and the Tower 2 insurers have argued their summary judgment motions against each other as all or nothing. Neither suggests what happens if one Interrelated Wrongful Act exists but First American's third-party complaint includes additional claims beyond those tied to the Interrelated Wrongful Act. Thus, their summary judgment motions must be denied on this point.

To the extent that the Tower 2 insurers submit that the First American action sets forth Interrelated Wrongful Acts with the items in the actual-claims notice, that argument is weaker than the contention that the First American action is interrelated with the potential-claims notice. The claims noticed in the actual-claims notice involved Fiserv's alleged failures to obtain a life tenant's signature and forward an LPI-policy claim from TD Banknorth to *Ticor*, to approve or process Sovereign's claims under QSS based on ownership or chain-of-title issues, to pay one claim by Wachovia under QSS regarding a lien left on a property by a prior owner, and TCF Bank's claim under ValueGuard. They are not part and parcel with Fiserv's alleged wide-scale failures to make sure First American's standards and guidelines were met for certificate issuance and to timely process *First American* title-insurance claims. No reasonable interpretation of the Interrelated Wrongful Acts provision would result in Fiserv's alleged wide-scale failure to timely notify First American of LPI-policy claims being deemed interrelated with one failure

42

to forward a claim to a different insurer.  On this issue the court will deny the Tower 2 insurers' motion for summary judgment and grant Fiserv's motion for summary judgment.

The Tower 2 insurers argue that the First American action is part of a single claim with the claims set forth in the actual-claims notice.  The ACE Westchester policy provides that

> [a]ll claims arising out of the same Wrongful Act and Interrelated Wrongful Acts of the Insured shall be deemed to be one Claim, and such Claim shall be deemed to be first made on the date the earliest of such Claim is first made, regardless of whether such date is before or during the Policy Period. All Damages and all Claims Expenses resulting from a single Claim shall be deemed a single Damage and Claims Expense.

(Doc. 122, Ex. 16 at FISERV-001349839.)  The provision is part of the ACE Westchester policy setting forth limits of liability and retention.  It is not labeled as an exclusion.  Instead, it governs whether the insured must cover one or more retention amounts and is limited to a per-claim maximum limit of coverage.  *See, e.g.*, *Am. Med. Sec., Inc.*, 393 F. Supp. 2d at 705–07 (discussing "single claim" language and noting that if thirty-eight other lawsuits were related to the Addison litigation all would be covered by the policy at issue and be subject to that policy's aggregate limit).  Exclusions are interpreted narrowly and against the insurer, and this court will not interpret language not set forth as an exclusion to be one.  If additional claims or litigation filed *after* the First American action related back, then this provision might apply.  But it does not provide a second prior-litigation exclusion for the Tower 2 insurers to avoid liability.

43

2.      Prior knowledge exclusion

Exclusion K (the "prior knowledge" exclusion) of the ACE Westchester policy provides that the insurer shall not be liable for damages or claims expenses on account of any Claim

> alleging, based upon, arising out of, or attributable to any Wrongful Act committed prior to the beginning of the Policy Period, if, on or before the earlier of the effective date of this Policy or the effective date of any Policy issued by the Company to which this Policy is a continuous renewal or replacement, the Insured knew or reasonably could have foreseen that such Wrongful Act would result in a Claim.

(Doc. 162, ¶ 21; Doc. 122, Ex. 16 at FISERV-001349838 (emphasis deleted).)

Fiserv tracked on a weekly or monthly basis the BOA claims that United General Title Insurance Company and First American were not paying; Fiserv maintained separate spreadsheets of all claims that were pending as well as those denied by the title companies. (Doc. 137, Ex. 2, ¶ 1; Doc. 159, ¶ 1.)  By email dated October 6, 2006, Sally Fantasia of Fiserv wrote to Brian Barlow of First American stressing the need to hold BOA claims review calls on a weekly basis. (Doc. 137, Ex. 2, ¶ 2; Doc. 159, ¶ 2.)  In various emails in October and November 2006 Fiserv employees wrote to employees of First American or United General regarding lenders' issues with pending title insurance claims. (*See* Doc. 137, Ex. 2, ¶¶ 3-8; Doc. 159, ¶¶ 3-8.)  For instance, Fiserv's Wayne Bzdula wrote to Steve Winkler at United General that Fiserv's Dave Stokes was "in Charlotte meeting with BOA tomorrow and has been forewarned that [First American] settlement delays will be a hot topic for discussion." (Doc. 137, Ex. 2, ¶ 7.)

An internal Fiserv communication dated May 2, 2007, concerning Fiserv's relationship with First American stated:

44

> Our one concern with the relationship is the high claims experience we are having with Bank of America and the related concern First Am has about the mounting losses. The BOA is driving a 60% claims experience vs 29% for all other lenders resulting in an overall program loss experience of 41%. First American had expected a 30% overall loss experience for the program which means they are trying to understand whether this is a short term cycle due to the housing softness or a fundamental flaw.

(Doc. 137, Ex. 2, ¶ 10; Doc. 159, ¶ 10; Doc. 138, Ex. K at FISERV-001198853.) Another internal communication on June 6, 2007, noted that First American had "become particularly difficult to work with in claims management and payment on the QuickClose product. To the point [sic] that they have denied claims we know to be covered by precedent and documentation which will lead to clients such as Bank of America challenging the claim response." (Doc. 137, Ex. 2, ¶ 11.)

On August 23, 2007, Fiserv received notice from First American that as of December 2007 it was withdrawing Fiserv's right to issue certain title policies. (Doc. 137, Ex. 2, ¶ 14.) According to Fiserv's Leslie Howlett, no First American representatives at a meeting in August 2007 mentioned that Fiserv had done something wrong. (Doc. 162, ¶ 23; Doc. 170, ¶ 23.) Prior to the filing of the First American action, Howlett was not aware of any criticisms by First American against Fiserv for its oversight of BOA's underwriting process. (Doc. 162, ¶ 24; Doc. 170, ¶ 24; Doc. 127, Ex. 47 at 78; Ex. 48 at 57-58.)

Regarding Fiserv's relationship with BOA, Fiserv's Thomas Warsop "met with Bank of America very regularly, and we were often praised for the work we were doing. The only displeasure that I recall in a general way was their displeasure at the speed of claim payment by First American." (Doc. 162, ¶ 26.) In an internal email dated June 25, 2008, a Fiserv employee wrote that BOA was "EXTREMELY concerned with the growing number

45

of aged claims." (Doc. 137, Ex. 2, ¶ 15.) Another internal email in September 2008 noted BOA's concern that the "claims are out of hand and ugly . . . . This is going to get very high – very quick at BOA. There is a deck being put together at a much higher level at BOA and when they review the numbers there will be a lot of concern around the program and claims process . . . . BOA wants us to be ready to come to the table with an action plan on how we are going to address these issues." (Doc. 137, Ex. 2, ¶ 16.) Another internal email, dated March 10, 2009, stated that during a BOA conference call "reference was made to the aged claims and the dollar value associated with those claims. . . . There were also comments around not using Fiserv across the board, potentially suing Fiserv, etc." (Doc. 137, Ex. 2, ¶ 17.)

By letter dated June 16, 2009, BOA's counsel wrote to United General concerning United General's alleged breach of its policy and bad-faith handling of BOA's claims under a master loan policy. BOA's counsel observed that "[a]ccording to the claims spreadsheet maintained by Fiserv, the Bank has more than 2,600 LPI claims that are pending with UGT at this time." Fiserv was copied on the letter. (Doc. 137, Ex. 2, ¶ 20.) In a letter dated June 25, 2009, BOA's counsel wrote to First American concerning alleged breach of its master loan policy and bad-faith handling of BOA's claims, stating that "[a]ccording to the claims spreadsheet maintained by Fiserv, the Bank has more than 370 LPI claims that are pending with First American at this time." Again, Fiserv was copied on the letter. (Doc. 137, Ex. 2, ¶ 21.[9])

_____

[9]Fiserv objects to this proposed finding as hearsay (Doc. 159, ¶ 21.), but the truth of the matter asserted is not at issue. At issue is whether Fiserv was apprised of the letter's allegations against First American.

46

According to a Fiserv executive vice president, Fiserv provided the potential-claims notice to the Tower 1 insurers because the NFCU

> litigation had commenced. I think we at Fiserv were seeing greater amounts of agitation, I guess, for lack of a better word, amongst some of our other clients, and looking at what we at least believed were our obligations under the insurance policy to notice potential claims, and pursued that with an abundance of caution of trying to notice as many potential claims as is appropriate.

(Doc. 141, ¶ 53.) The VP stated further that Fiserv had "an insurance policy coming to an end and we want to make sure that if something is appropriately covered under that policy, that we get it on notice." (Doc. 141, ¶ 54.) Fiserv's Warsop testified about the potential-claims notice that "what had happened at this time was that we had—there was now increased scrutiny because Navy had . . . we now had an action by one of our financial institution clients which we'd never had before." (Doc. 141, ¶ 55.)

Prior to the inception of Tower 2 insurance, First American or United General made demands on Fiserv seeking reimbursement or payment by Fiserv to the lender of three individual LPI-policy claims regarding which Fiserv was alleged to have made some process error when attempting to record the liens, recording a mortgage in the wrong county for one borrower (Robinson) and failing to timely file a mortgage regarding the other borrowers (apparently Jala and Lee). (Doc. 137, Ex. 2, ¶ 26; Doc. 159, ¶ 26; Doc. 138, Exs. Y, Z.) Also prior to the inception of Tower 2 insurance, Ticor sued Fiserv seeking $29,300 plus fees and costs in reimbursement for Ticor's payment to Fleet on a title-insurance policy because Fiserv allegedly did not properly conduct a title search to verify that the borrower had title to the subject property in New York. (Doc. 138, Ex. AA.)

47

The Tower 2 insurers argue that the potential-claim notice demonstrates Fiserv's knowledge prior to the inception of the Tower 2 insurance that it had committed a Wrongful Act that would result in a claim or lawsuit brought by First American. However, as discussed above, the potential-claims notice discussed the claims of Fiserv's lender-clients regarding duties owed to and actions involving them, not claims of title insurers regarding duties owed to and actions involving them. Fiserv knew *BOA* might sue, but that knowledge does not mean that Fiserv knew *First American* would sue.

The Tower 2 insurers contend that Fiserv's tracking of BOA claims and awareness of BOA's concerns about delayed payment on LPI-policy claims evidence knowledge of a Wrongful Act that could result in a claim. But the tracking of BOA's LPI-policy claims and discussions with BOA pursuant to Fiserv's SOW duties does not establish that Fiserv knew of failures regarding its responsibilities to First American under the National Agency Agreement. Taken in either parties' favor, the above-described evidence shows only that Fiserv knew about complaints by and concerns of BOA regarding the processing of title-policy claims—not that Fiserv knew about complaints by and concerns of First American.

Further, the Tower 2 insurers contend that Fiserv knew of the pertinent Wrongful Acts due to the specific demands Fiserv received from First American and United General prior to inception of the Tower 2 policies. However, no reasonable jury would find that two individual claims regarding specific failures of Fiserv in those cases—failure to timely record one mortgage and recording another in the wrong county—put Fiserv on notice of First American's claim regarding systemic failures across the board by Fiserv in issuing LPI certificates and processing LPI-policy claims totaling millions of dollars in damages.

48

In sum, no reasonable jury would find in the Tower 2 insurers' favor that Fiserv *knew* its activities would result in the First American action. The undisputed evidence shows that Fiserv knew about potential claims from *lenders*, not First American or other title insurers.

However, exclusion K also eliminates coverage if Fiserv "reasonably could have foreseen that such Wrongful Act would result in a Claim." (Doc. 162, ¶ 21; Doc. 122, Ex. 16 at FISERV-001349838 (emphasis deleted).) And on that point, a question of fact exists. Taking the evidence in Fiserv's favor, Fiserv had no inkling prior to July 1, 2009, that any of its actions would generate a lawsuit brought by the First American. Fiserv's executives indicate that Fiserv noticed the Tower 1 insurers of potential claims because of the NFCU claim, demands from TD Banknorth and three other lenders, and the concerns of additional lenders. The evidence shows that Fiserv was focused on lenders' complaints, and especially on BOA's complaints. Other than the two individual and discreet demands by First American regarding specific actions in two individual transactions, First American had voiced no concerns to Fiserv.

But taking the evidence in the Tower 2 insurers' favor, Fiserv was the middleman in the large QuickClose program and problems were obvious and escalating regarding submission of title-policy claims by BOA through Fiserv to First American. Moreover, in late June 2009, before the Tower 2 insurance went into effect, Fiserv was copied on two demand letters BOA sent to First American and another title insurer. Again, Fiserv's position as middleman should have tipped it off that it could be brought into the BOA/First American dispute by *either* of those parties. Though Fiserv's gaze was fixed on the lenders' side of the QuickClose program, Fiserv should have known that, in addition to its acts generating actual or potential claims by lenders, it had committed Wrongful Acts

49

generating potential claims by the title insurers. Further, the prior claims of First American and Ticor regarding errors in individual cases suggested that the title companies were not averse to looking to Fiserv for reimbursement, especially as the number of LPI-policy claims multiplied. In the QuickClose program Fiserv served two clients, and when its actions in serving one, particularly as to the processing of title-policy claims, were generating potential liability, it should have foreseen that its actions in serving the other would as well—or so a reasonable jury could find.

Therefore, summary judgment will be denied as to this claim, which requires a jury's determination.

3.      Underwriting exclusion

An endorsement to the ACE Westchester policy excludes any claim "alleging, based upon, arising out of, or attributable to any underwriting authority contracts when such Claim is made by the authorizing insurance carrier." (Doc. 154 at 46, ¶ 89; Doc. 122, Ex. 16 at FISERV-001349858 (emphasis deleted).)

Common definitions of "underwrite" in the insurance sense include "[t]o sign (an insurance policy) so as to assume liability in case of specified losses," "[t]o insure," and "[t]o insure against losses to the extent of (a given amount)." Webster's II New Riverside University Dictionary 1259 (1994) (definition 3). An underwriter has been defined as one engaged in an insurance business or "[a]n insurance agent who assesses the risk of enrolling an applicant for overage or a policy." Webster's II New Riverside University Dictionary 1259 (1994) (definition 1).

The Tower 2 insurers have not persuaded the court that this exclusion covers the issuance of LPI certificates, which appears to be more of an administrative role than

50

"underwriting."  The Tower 2 insurers have presented no evidence that the duties of Fiserv as title agent respecting First American included authority for assessing risk, approving coverage, or insuring against any losses.  First American's third-party complaint against Fiserv alleges agent administrative failures in policing BOA's lending procedures, issuing certificates, and forwarding claims—not failures in assessing risk and approving insurance on behalf of First American.

Therefore, the court will deny the Tower 2 insurers' motion for summary judgment and grant Fiserv's motion for summary judgment on this point.

4.      Prior and pending litigation exclusion

An endorsement to the ACE Westchester policy excludes any claim alleging, based on, arising out of, or attributable to "any prior or pending litigation, Claims, demands, arbitration, administrative or regulatory proceeding or investigation filed or commenced on or before 07/01/2009, or alleging or derived from the same or substantially the same fact, circumstance or situation underlying or alleged therein."  (Doc. 122, Ex. 16 at FISERV-001349854 (emphasis deleted).)

The Tower 2 insurers submit that the First American action relates back to Ticor's pre-Tower 2 lawsuit mentioned in subsection 2 above  (in which Ticor sought payment on one title-insurance policy because Fiserv allegedly did not properly conduct a title search to verify that the borrower had title) and, therefore, is excluded.  Further, argue the Tower 2 insurers, regarding this exclusion, the First American action relates back to the TD Banknorth, Sovereign and Wachovia claims.

The court disagrees.  The First American action does not involve the *same* or substantially the same facts as Ticor's lawsuit.  No party has established that Ticor and

51

First American are related companies, so the cases were brought by separate entities. Further, Ticor alleged one instance of Fiserv error in a Fleet QuickClose transaction, not the widespread title-agent and claim-processing errors regarding BOA QuickClose transactions that First American alleged. That the Ticor action and First American action involved QuickClose transactions is not enough to make them the same or substantially the same. For a similar reason, the First American action is not the same as the TD Banknorth claim, either. And the Sovereign and Wachovia claims concerned QSS and different insurance.

CONCLUSION

For the reasons set forth above,

IT IS ORDERED that the motions for summary judgment by National Union and Continental Casualty (Docs. 133, 143) are granted and all claims against those insurers are dismissed.

IT IS FURTHER ORDERED that Fiserv's motion for summary judgment (Doc. 139) is denied as against National Union and Continental Casualty, denied as against Endurance and XL regarding the should-have-known portion of exclusion K and whether untimely LPI-claim processing involves an Interrelated Wrongful Act, and otherwise granted as against Endurance and XL.

IT IS FURTHER ORDERED that Endurance and XL's motion for summary judgment (Doc. 137) is denied.

IT IS FURTHER ORDERED that the court will conduct a telephonic status conference for Fiserv, Endurance, and XL on November 7, 2016, at 3:30 p.m. The parties should be prepared to address any proceedings that may be required regarding the notice

52

issue discussed in letters postdating the summary judgment briefing (*see* Docs. 203–206), final pretrial and trial dates, as well as mediation.

Dated at Milwaukee, Wisconsin, this 30th day of September, 2016.

BY THE COURT

/s/ C.N. Clevert, Jr.
C.N. CLEVERT, JR.
U.S. DISTRICT JUDGE